LASSER, P.J.T.C.
Taxpayer contests the 1990, 1991 and 1992 real property tax assessments on taxpayer’s paper manufacturing facility located on Frenchtown Road at its intersection with Ravine Road in Milford Borough, shown as Block 19, Lot 51 on the Milford Borough tax map. Taxing district filed counterclaims for the years 1990 and 1991 seeking an increase of the property’s assessment. The assessments in issue are:
1990 & 1991 1992
Land $ 748,500 $ 738,500
Improvements 11,983,800 11,983,800
Total $12,732,300 $12,722,300
The relevant ratios of assessment to true value of the Director
of the Division of Taxation for Milford Borough pursuant to N.J.S.A, 54:1-35.1 et seq. for the applicable years are:
Year Common Level Lower Limit Upper Limit
1990 99.67% 84.72% 114.62%
1991 103.23% 87.75% 118.71%
1992 90.12% 76.6% 103.64%
At the close of trial, taxpayer moved to dismiss taxing district’s 1990 and 1991 counterclaims on the ground that taxing district failed to present any supporting evidence of value.
The subject property is a manufacturing complex producing specialty papers and is owned and occupied by Riegel Products, a Division of James River Corporation. This 56.54-acre parcel of land is located on the west side of Frenchtown Road and Milford *549 Creek and at the east bank of the Delaware River in Milford Borough, Hunterdon County. The property’s shape is irregular with frontage of approximately 1,000 feet on Frenchtown Road, 108 feet on Ravine Road and 88 feet on Carpenter Street.
Located on the subject is a masonry and steel-frame industrial complex constructed between 1907 and 1971 having a gross building area of 870,169 square feet as follows:
Area (sq. ft.) Percentage of total area
Office 60,871 7%
Warehouse 353,498 40.6%
Manufacturing 388,313 44.6%
Cogeneration 1,820 .2%
Service 65,667 7.6%
Total 870,169 100%
The floor areas of this complex are:
Area Percentage of
(sq. ft.) total area
Basement 275,935 31.7%
Ground 541,322 62.2%
Elevated 51,092 5.9%
Cogeneration 1,820 .2%
Total 870,169 100%
The property has a land-to-building ratio of approximately 2.8 to 1. The principal buildings are the main manufacturing complex containing 794,535 square feet and the coating plant containing 43,453 square feet. The remaining structures include two brick dwellings, a wood-frame dwelling used as a health center, a cogeneration facility and a drum-storage facility. The buildings located on the subject were constructed during the following time periods:
*550 Area Percentage of total area Time period (sq. ft.)
Pre- 1910 152,644 18%
247,527 From 1910 up to 1930 28%
163,913 From 1930 up to 1940 19%
107,784 From 1940 up to 1950 12%
162,420 From 1950 up to 1960 19%
35,881 ■ 1960 and later 4%
Total 870,169 100%
The subject is serviced by public utilities including water and sewer. In áddition, Riegel’s paper manufacturing process, which requires substantial quantities of water and power, draws approximately 4.5 million gallons of water each day from the Delaware River and three on-site wells. This water is returned to the river after solid and organic matter has been removed by on-site primary and secondary water treatment processes.
This facility produces approximately 175 tons of paper each day operating three shifts, 24 hours a day. An average of 1,000 pounds of steam are required to produce each ton of paper. A cogeneration facility, renovated in 1989, produces steam and electricity for primary use in RiegeFs paper manufacturing operations.[1] Steam or electricity produced in excess of the plant’s needs is sold to Jersey Central Power and Light Co.
Yard improvements include 460,000 square feet of macadam and gravel-paved internal roads, parking and storage areas and 4,000 lineal feet of barbwire cyclone fencing with gates. The property *551 also has approximately 3,100 lineal feet of rail siding which includes track serving an eight rail car loading platform located inside the main complex and on-site switching facilities.
Substantially all of the complex is situated in the Federal Emergency Management Agency (FEMA) “A” flood zone. There is no evidence that any part of the property is wetland.
The subject is zoned for industrial use but does not conform with present zoning ordinances which restrict permissible lot coverage, building height and front-yard depth.
/.

Taxpayer’s Sales Comparison Approach.

Taxpayer’s expert testified that the highest and best use for the subject is general manufacturing, industrial and warehousing use. Taxpayer’s expert testified that he did not value the property as a paper manufacturing plant but as a general manufacturing and warehouse facility. He testified that he did not include the value of specific features of the property such as rail sidings, high ceilings, water supply and water treatment facility.[2] Taxpayer’s expert states that there is no certainty that a buyer, who requires such features, would be found and therefore, such features should not be included in the value determination. He estimated the value of the subject by use of the sales comparison and cost approaches to value. This expert disregarded the income approach as too speculative due to what he regarded as a substantial amount of available industrial space in the region and the difficulty an investor would have locating financing for a complex the size of the subject.
In his sales comparison approach, this expert relied on sales of five industrial complexes, two in Mercer County and one each in Burlington, Union and Camden counties, occurring between November 1987 and July 1991:
*552 Sale Gross Bldg. Land Area Area Price Sale Sale In Sq. In Ratio No. of % Per Location Date Price Feet Acres L/B Stories Office Age Sq.Ft.
#1 USG, Delanco Tp., 11/87 Burlington Co., NJ ,000 312,700 47.5 6.6:1 > 1965- $ 9.11 1972
1 & #2 Sleeper, Linden 7/87 $8,750,000 607,529 26.5 2:1 pt.2 Union Co., NJ 5% 1919- $14.40 1935
#3 Roebling, Trenton 4/88 $2,000,000 292,388 9.94 1.5:1 1 Mercer Co., NJ Z% 1920’s $ 6.84
#4 Muirfield 7/91 $1,900,000 192,586 9.565 2.16:1 1 Pennsauken Tp., Camden Co., NJ 4% 1960, $ 9.87 1964, 1970
#5 Lenox, Trenton, Mercer Co., NJ 1 & 3/89 $ 925,000 132,700 2.697 .9:1 pt.4 23% 1899- $ 6.97 1921
Based on these sales, this expert estimated a value of $8.06 a square foot (gross building area and land combined) for the subject to arrive at a $7,015,000 (rounded)[3] value by this approach for 1990, 1991 and 1992.

Taxpayer’s Cost Approach.

This expert determined the subject’s land value, for use in his cost approach, by applying the sales comparison approach to four land sales, three in Gloucester County and one in Warren County, occurring between May 1989 and November 1991.
From these land sales, this expert estimated the land value to be $13,265 an acre and the total land value by this approach to be $750,000 (rounded)[4] for 1990, 1991 and 1992.
This expert estimated the reproduction cost new (RCN) of the subject to be $43,748,335 utilizing a cost manual with cost estimates adjusted to the valuation date. To arrive at the subject’s RCN, this expert estimated RCN of the buildings to be $42,150,-835, the cogeneration facility to be $149,175, and the yard improvements to be $1,448,325. In his analysis, taxpayer’s expert rated 87% of the facility in fair physical condition and the remainder of the facility in good condition.
*553 As part of taxpayer’s expert’s cost approach, he utilized the extraction method to analyze market-derived depreciation from the five sales of improved properties used in his sales comparison approach. For each of these five properties, taxpayer’s expert, (1) deducted his opinion of the property’s land value from its selling price to determine the portion of the selling price attributable to improvements, (2) estimated the RCN of improvements, (3) subtracted the selling price attributed to improvements from the RCN to arrive at his estimated accrued depreciation and (4) divided the estimated accrued depreciation by cost new of improvements to yield an improvements depreciation rate.
Taxpayer used four land sales to support his land value deductions from the purchase prices of his five improved sales. He calculated the cost of the improvements of these five sales from general descriptions in marketing brochures and applied average costs from a cost manual for properties in generally good condition. This expert calculated the market depreciation reflected by the five industrial sales as follows:
Sale Sale Date Sale price Land Value per acre Land value Sale Price /Imprvt. Reproduction Est. cost new depr.
USG 11/87 $2,850,000 $ 15,000 $ 712,500 $2,137,500 $10,700,000
Sleeper 7/87 $8,750,000 $100,000 $2,650,000 $6,100,000 $26,885,000 77%
Roebling 4/88 $2,000,000 $ 30,000 $ 298,200 $1,701,800 $ 9,300,000
Muirfield 7/91 $1,900,000 $ 50,000 $ 478,250 $1,421,750 $ 8,060,000
Lenox 3/89 $ 925,000 $ 25,000 $ 67,425 $ 857,575 $ 5,460,000
This expert opined that the subject property fell in the upper portion of the indicated accrued depreciation range and concluded total depreciation of the subject to be 84%. This was allocated 40% to physical deterioration (1% a year of the subject’s effective age) and 44% to functional and/or economic obsolescence.
In his cost approach, taxpayer’s expert treated the structure containing the cogeneration facility as real property and all machinery and equipment contained therein as personal property.
Taxpayer contends that the cogeneration facility is a manufacturing process separate from the paper manufacturing operations, producing and selling electricity and steam. In support of taxpayer’s assertion that the cogeneration facility is a separate manufac *554 taring process, a vice president of Cogeneration Services, Inc., an authorized agent of Kaemin Milford Limited Partnership’s managing partner, Kaemin Engineering Milford Cogen Corporation, testified that if the taxpayer discontinued its paper-manufacturing operation, all power produced by the cogeneration facility could be sold to Jersey Central Power and Light Company. Therefore, taxpayer concludes that the production of electricity and steam is a separate manufacturing operation and that the cogeneration machinery and equipment is personal property, exempt from property taxation under N.J.S.A 54:4r-l because it used in business as a part of a production process.
Taxpayer also argues that the machinery and equipment were not included in the contested assessments and therefore, the taxing district bears the burden of proving the value of the machinery and equipment that falls outside the exclusion set forth in N.J.S.A 54r4—1(b).[5]
Taxpayer’s expert then calculated the value of the subject utilizing the cost approach as follows:
Reproduction cost new of building & impvts. $ 43,748,335
Less accrued depreciation (84%) — 36,748,601
Depreciated value of buildings & impvts. $ 6,999,734
Estimated land value + 750,000
Total value $ 7,749,734
(Rounded to) $ 7,749,000
This expert rejected the cost approach and relied on the sales comparison approach to reach his final estimate of value of $7,015,000.

*555
II.

Taxing District’s Contentions.

Taxing district asserts that the original assessment is presumed correct and that the evidence presented by the taxpayer has not overcome this presumption. Taxing district further contends that the only reliable evidence of value is the $43.7 million reproduction cost estimate for the subject property.
Taxing district contends that the highest and best use of the subject includes utilization of the cogeneration facility, rail sidings, high ceilings and water supply and that such features should accordingly be reflected in the value of the property.
Taxing district argues that the taxpayer’s expert’s sales comparison approach is not credible or reliable since the sales data used is not comparable to the subject property. Taxing district claims that the depreciation figures used by taxpayer’s expert lacked credibility and reliability since they were extracted from sales of property not comparable to the subject.
Taxing district did not offer an appraisal of the subject property, but provided expert testimony only with regard to the value of the cogeneration facility and classification of its building and equipment. Taxing district’s expert considered the total cogeneration facility, including machinery and equipment, to be real property. He estimated its value at $25 million based on a $22 million mortgage secured by the facility and an estimated equity interest of $3 million.
Taxing district’s expert testified that the primary function of the subject property is to manufacture paper and that like a “roof,” the cogeneration facility is a necessary part of the real property and not a separate manufacturing process. He concluded from this the cogeneration facility is real property not personal property under N.J.S.A. 54:4-l(b).
Taxing district also contends that N.J.S.A 54:4-1 (b) should be applied prospectively, not retrospectively, and consequently does not apply to the subject property for the tax years under appeal because the statute was enacted on June 26, 1992, a date subse *556 quent to dates on which the assessments in question were made. Taxing district, citing Switz v. Kingsley, 37 N.J. 566, 572, 182 A.2d 841 (1962), asserts that applying the statute retroactively would result in disparate assessments and controvert the uniformity clause of the New Jersey Constitution, art. VIII, § I, H 1(a).

III.

Taxpayer’s Expert’s Five Improved Sales.

The crucial issue for decision in this case is the analysis of the five improved sales relied on by the taxpayer’s expert.
The first improved sale used by the taxpayer’s expert in his sales comparison approach is a 47.5-acre parcel located on Burlington Avenue, south of Princeton Avenue, in Delanco, Burlington County, New Jersey. United States Gypsum Company (USG) sold this property to River Associates for $2,850,000, or $9.11 a square foot, in November 1987.[6] The total parcel has 36 ± acres of building area, 11.5 ± acres of wetland and 994 feet of frontage on the Delaware River. The subject of this sale is zoned industrial. The property has three one-story buildings built between 1965 and 1972, with a gross building area of 312,700 square feet and 580 feet of rail track including siding for three cars inside the main plant. This property was sold vacant for a warehouse and distribution center.
Taxpayer’s second improved industrial sale is a 26.517-acre parcel located at 2525 Brunswick Avenue, between Allen Street and Park Avenue, in Linden, Union County, New Jersey. This property was sold by Sleeper Associates (Sleeper) to Brunswick Park Associates for $8,750,000, or $14.40 a square foot, in July 1987. The subject of this sale is zoned industrial and contains a *557 one-and partial two-story building built between 1919 and 1935, with a gross building area of 607,529 square feet. Sleeper leased back approximately one-half of the property for one year following the sale and the property was converted from a manufacturing facility to a multi-tenant industrial complex.
Taxpayer’s third improved industrial sale is a 9.94 ± -acre parcel located at 81 Hamilton Avenue, in Trenton, Mercer County, New Jersey, which is zoned industrial and contains 16 interconnected buddings built during the 1920s, with a gross building area of 292,388 square feet. This property, the former Roebling manufacturing facility (Roebling), was sold by Bridón American Corporation (Bridón) to D.B. Realty IV for $2,000,000, or $6.84 a square foot, in April 1988. The property was sold for use as a multitenant warehouse and light-industrial complex.
Taxpayer’s fourth improved industrial sale is a 9.565-acre parcel located at 825 Hylton Road, Pennsauken Township, Camden County, New Jersey, This property is zoned light industrial and contains a one-story building built in 1960, 1964 and 1970 with a gross building area of 192,586 square feet and twelve loading docks. This property was sold by Muirfield Holdings (Muirfield) to Quadriga Art, Inc. for $1,900,000, or $9.87 a square foot, in July 1991.[7] Following sale, the property was converted from a glass-processing facility to a multi-tenant complex.
Taxpayer’s fifth improved industrial sale is a 2.697-acre parcel located at North Olden and Prince Streets, Trenton, Mercer County, New Jersey. This property, a former china manufacturing facility, was sold “as is” by Lenox, Inc. to Roscom for $925,000, or $6.97 a square foot, in March 1989. This property is zoned industrial and contains 17 one- and four-story interconnecting buildings built between 1900 and 1921 with a gross building area of 132,700 square feet. Following sale, the property was converted from a manufacturing facility to a multi-tenant industrial complex.
*558 Taxpayer’s appraisal expert made the following adjustments to compare these industrial properties to the subject:
Adjusted Unit Land to Unit Selling Age/ Building Market Selling Grantee Location price Size % Location % Condition % Ratio % Conditions % Price
USG Delanco 9.11 -5 -3 -10 -14 0 $ 6.19
Sleeper Linden 14.40 -3 -26 0 +14[8] 0 12.24
Bridón Trenton 6.84 - 6 — 8 + 20 +13 0 8.14
Muirfield Pennsauken 9.87 -7 -18 -5 +7 0 7.60
Lenox Trenton 6.97 -7 -3 +20 +16 0 8.78
In his calculation of market depreciation taxpayer’s expert relied on four land sales (see chart on page 553 of this opinion). Taxpayer’s expert first used the sale of what he stated to be a 64.88-acre parcel,[9] located at Broad Street and the Pennsylvania Turnpike, Florence Township, Burlington County, New Jersey, to calculate the market depreciation reflected by the USG sale. Title in this sale was conveyed by quitclaim deed in December 1985 and taxpayer’s expert conceded that it is probable that this was not an arms-length sale. This property is zoned general manufacturing and was sold by Penn Central Corporation to J.D. Construction Company in December 1985 for $825,000 or $12,716 an acre.[10] This expert used a land value of $15,000 an acre for the USG property. If he had used $12,716 an acre he would have found depreciation of 79%. If he had used 67.226 acres he would have found land value of $12,272 and depreciation rate of 71.8%.
Taxpayer’s expert’s second sale of a 21.25-acre parcel, located at 261-329 North Avenue, East Elizabeth, Union County, New Jersey, was used to calculate the land value of the Sleeper sale. This is the sale of a commercial property, sold by the Port Authority of New York and New Jersey to IKEA Development Co. for retail store purposes in October 1988 for $3,718,750 or *559 $175,000 an acre. This expert used a land value of $100,000 an acre for the Sleeper property to find a depreciation rate of 77%. If he had used $175,000 an acre he would have found 84.7% depreciation. If he had used $75,000 an acre he would have found 74.85% depreciation. However, land sold for a large retail complex cannot be compared to land for industrial use.
Taxpayer’s expert next used a purported sale of a 18.04r-acre parcel, located at North Olden Avenue and Oak Street, Trenton, Mercer County, New Jersey, to calculate the land value of the Roebling and Lenox sales. This witness testified that a sale from the City of Trenton (Trenton) to J. Vinch & Sons, Inc. took place in February 1989 for $865,000 or $47,949 an acre. On cross-examination this expert could not produce a deed reference or evidence that this sale was consummated. This purported sale was used as support for land value of $30,000 an acre in his depreciation analysis of the Roebling property, and $25,000 an acre in his depreciation analysis of the Lenox property without justification for the use of different land values for these two Trenton improved sales.
Taxpayer’s expert finally used the sale of a 5.49-acre parcel, located at 100 and 104 Whittendale Drive West, Moorestown, Burlington County, New Jersey, to calculate the land value of the Muirfield sale. This property is zoned industrial and was sold by Martin Price to MBO Binder & Company in March 1988 for $435,200 or $79,271 an acre. This expert used a land value of $50,000 an acre in his depreciation analysis of the Muirfield property.
This witness gave no explanation for the variances between the four sale prices and the five land values he used in his depreciation analysis.

IV.

Conclusion.

I find that the highest and best use of the subject property is for heavy manufacturing, paper manufacturing and kindred *560 uses; manufacturing wMch requires large space, heavy floor loads, high ceilings, railroad service onto the floor of the plant, water treatment facilities and a substantial supply of water and power. The five improved sales utilized by taxpayer’s expert in his sales comparison approach are not comparable because of the substantial difference from the subject in size and utility and because the properties were sold vacant and purchased either for warehouse or multi-tenant use, not heavy manufacturing. As such, these sales do not provide evidence of value for many of the characteristics of the subject such as the water supply, waste-water treatment facility, inside rail loading, on-site cogeneration facility, heavy floor loads and high ceilings. No sales of paper manufacturing plants were included in taxpayer’s expert’s report or testimony.
I do not find taxpayer’s expert’s first improved sale, USG, to be evidence of the subject’s value because it occurred in 1987, a year which is remote from the valuation dates of October 1989-91. The building is smaller (312,700 sq. ft.). Twenty-five percent of the USG property is wetlands. This property was sold vacant for use as a warehouse. Further, I find the information related to this sale is unreliable because taxpayer’s expert had not seen the property since the early 1980s and obtained most of his information from the selling brochure created for-the property.
I do not find expert’s second improved sale, Sleeper, to be evidence of the subject’s value because it was sold in 1987 and the sale incorporated a one year lease-back to the seller. There is no evidence to quantify the effect this lease arrangement had on the sale price. In addition, this property is located in an urban area which is a different market and was sold for multi-tenant industrial use.
I do not find that taxpayer’s expert’s third improved sale, Roebling, provides evidence of the subject’s value because it is a smaller building (292,386 sq. ft.) located in an urban area on a much smaller parcel of land (9.94 acres versus 56.54 acres) and in poor condition. In addition, I find the information related to the sale unreliable because this expert could not testify that the *561 broker from whom he obtained the sale information was a participant in the sale.
I do not find that taxpayer’s expert’s fourth improved sale, Muirfield, provides evidence of the subject’s value because it is a smaller building (192,586 sq. ft.) on a small parcel of land (9.6 acres) sold as vacant property for conversion to multi-tenant warehouse and industrial space. This facility is in a different market than the subject, has lower ceilings and does not have the same features as the subject.
I do not find that taxpayer’s expert’s fifth improved sale, Lenox, provides evidence of the subject’s value because the building was smaller (132,700 sq. ft.) on a small parcel of land (2.7 acres) and sold vacant for use as a warehouse. This facility was sold in an “as is” condition, is in an urban area, which is a different market from the subject, and does not have the same features as the subject.
Photographs of the subject in taxpayer’s expert’s report indicate that the subject property appears to be in good condition. However, taxpayer’s expert used fair condition to calculate the cost of the subject and good condition to calculate the cost of four of his five improved sale properties which, from photographs, appear to be, at best, in condition similar to the subject.
I find that these five improved sales are not comparable to the subject and therefore are unreliable for the purpose of valuing a large, heavy manufacturing property such as the subject. Use of sales of vacant property purchased for warehouse or multi-tenant use are not evidence of the market value of a fully utilized manufacturing plant having real property features suitable for heavy manufacturing. These properties were purchased for a different use which required the purchaser to deduct from the purchase price the conversion cost. The hypothetical purchaser of the subject is not the purchaser of a vacant building but, a “hypothetical buyer ... whose requirements are reasonably accommodated by the property in question.” CPC Int’l v. Englewood Cliffs Bor., 193 N.J.Super. 261, 268, 473 A.2d 548 (1984). I therefore rely on the cost approach to value the subject.
*562 Taxpayer argues that valuation of the subject property should be based on market value or value in exchange, rather than value in use. In determining market value, there is a fundamental assumption that the price a purchaser will pay for a property is based on the purchaser’s conclusions about the most profitable use of the property. American Institute of Real Estate Appraisers, The Appraisal of Real Estate at 45 (10th ed. 1992). “Use value focuses on the value real estate contributes to the enterprise of which it is part, without regard to the property’s highest and best use or the monetary amount that might be realized upon its sale.” Id. at 22. In this case, determination of market value of the subject must consider the value of its physical characteristics, i.e., general heavy manufacturing, paper manufacturing and kindred uses and its other special real property features to a hypothetical purchaser who requires this type of property. Since I find that the present use of the subject is its highest and best use, my finding of value is based on market value in exchange to a hypothetical purchaser at the property’s highest and best use, not its value in use. The inquiry is not with respect to the value of the property to the owner, but rather to its market value at its highest and best use regardless of who might own it.[11]
I accept taxpayer’s expert’s $43,748,335 RCN for the subject as did taxing district in this case. I accept taxpayer’s expert’s physical depreciation rate of 40% but do not accept this expert’s additional 44% deduction for obsolescence for a manufacturing property which is operating three shifts, 24 hours a day, has a newly renovated cogeneration facility and is in a location which affords it the ample water supply needed for its manufacturing operations.
I reject the depreciation extraction method employed by taxpayer’s expert to determine this depreciation rate because the three land sales and one purported land sale he used to support his analysis do not support the land value taxpayer’s expert used to *563 subtract land value from the sale price and because the five improved sales are not comparable to the subject.
Given the reasons cited above and this property’s special features, an obsolescence rate of 44% to yield a total depreciation rate of 84% is excessive. There is ample justification to limit the obsolescence rate to not more than 33%.
The subject land assessments of $748,500 and $738,500 are not in dispute. Taxpayer’s expert valued the land at $750,000.
The assessment for improvements of $11,983,800 is in contest. Taxpayer’s expert allocated $6,265,000 to improvements.
The improvements assessment of $11,983,800 represents taxpayer’s reproduction cost new of $43,748,335 depreciated at the rate of 72.6% or 32.6% for economic and functional obsolescence added to 40% physical depreciation.
I find that a deduction of 72.6% for depreciation from all causes is reasonable for the subject and that the proper value and assessment for the years in issue is $11,983,800 for improvements and $748,500 for land or a total of $12,732,300.[12]
Taxing district presented no evidence of the value of the entire paper manufacturing plant and did not submit an appraisal report in evidence. With reference to the newly constructed cogeneration facility, taxing district’s expert stated that the value of the cogeneration facility was “probably” $25,000,000. I do not accept taxing district’s expert’s probable value because it is based solely on the existence of a $22,000,000 mortgage and this expert’s opinion that the owner would have “some equity in it.” This mortgage appears to be a financing transaction, not a sale, and may include real and personal property. Therefore, it is not evidence of the value of the real property. In my cost approach value, I have included the value of the cogeneration facility and it is my conclusion that an average depreciation rate of 72.6% is *564 appropriate for the entire subject facility. Therefore, having rejected taxing district’s valuation of the cogeneration facility, I do not find it necessary to address taxing district’s contentions as to the use of this facility or the constitutional argument regarding the retroactivity of N.J.S.A. 54:4-1. Taxpayer’s motion to dismiss taxing district’s counterclaims for 1990 and 1991 is granted.
I find that the assessment for each of the years is within the common level range as shown in the ratio studies of the Director of the Division of Taxation pursuant to N.J.S.A 54:l-35a (chapter 123) and therefore the assessments are affirmed.

 This cogeneration facility is owned by Kaemin Milford Limited Partnership for which Kaemin Milford Cogen Corporation is general partner, but is not separately assessed.

 Although the subject has special features neither the parties nor the court have treated it as special purpose property.

 870,169 sq. ft. X $8.06 = $7,013,562

 56.54 acres X $13,265 = $750,003

 Contra Badische v. Kearny Town, 11 N.J.Tax 385, 396 (Tax 1990) (citing Chevron U.S.A. Inc. v. Perth Amboy, 9 N.J.Tax 571, 581 (Tax 1988)).

 This property had been purchased in 1981 by USG for manufacturing purposes for $3,289,568. The sale in 1987 at $2,850,000 vacant and for warehouse indicates a higher value for manufacturing space than for property sold vacant for warehouse space. Manufacturing requires a higher grade of improvements such as toilet and locker facilities for employees and more substantial power.

 This property had been sold in March 1990 for $2,060,000.

 Taxpayer’s report reflects this as a negative adjustment. However, in his testimony, he stated that this should have been positive.

 The deed stated the parcel was 67.226 acres.

 Taxpayer’s expert initially testified that the sale occurred in May 1986 but conceded on cross-examination that the sale occurred in December 1985.

 See n. 6 in opinion of Hon. Michael A. Andrew, Jr. in Ford Motor Co. v. Edison Tp., 10 N.J.Tax 153, 167 (Tax 1988).

 The land assessment for 1992 is $10,000 less than 1990 and 1991. The difference is de minimus and I do not choose to change either land assessment figure to taxpayer's $750,000 value.