KUSKIN, J.T.C.
TABLE OF CONTENTS
I. Background........................................... 102
II. The Subject Property................................... 105
III. The Definition of Highest and Best Use................... 107
IV. Plaintiffs Proofs 109
*102 V. Defendant’s Proofs..................................... 114
VI. Plaintiffs Rebuttal Proofs............................... 117
VII. Analysis .............................................. 119
A. The Definition of Market Value....................... 119
B. The Hypothetical Market — Ford Motor Co. v. Edison Township and Preceding and Subsequent Decisions..... 122
C. The Hypothetical Market — Decisions in Other States .... 133
D. The Actual Market.................................. 140
VIII. Use Value versus Value in Use........................... 145
IX. Plaintiffs Failure of Proof as to Alternate Uses............ 149
X. Conclusion............................................ 155
I.
Background
Plaintiff General Motors Corp. appealed the property tax assessments on its automobile assembly plant in the City of Linden for tax years 1983 through 2003. The full procedural history of the appeals is set forth in General Motors Corp. v. City of Linden, 20 N.J.Tax 242, 258-59 (2002). In summary, the tax year 1983, 1984, and 1985 appeals were tried in the Tax Court. The Appellate Division reversed the Tax Court’s decision and remanded the matter. General Motors Corp. v. City of Linden, 13 N.J.Tax 324 (App.Div.), certif. denied, 134 N.J. 561, 636 A.2d 519 (1993). In 1992, the Legislature enacted the Business Retention Act, L. 1992, c., 24 §§ 1-7. In the context of the 1983, 1984, and 1985 appeals, defendant challenged the constitutionality of the Act. The Supreme Court held that the Act was constitutional and affirmed the Appellate Division’s remand of the appeals to the Tax Court. General Motors Corp. v. Linden, 150 N.J. 522, 696 A.2d 683 (1997).[1] Plaintiffs appeals for tax years 1986 through 2003 are *103 before me as a result of direct filings with the Tax Court. By agreement of the parties, the trial as to all years under appeal has been divided into three parts, with the first part limited to the issue of the taxability of certain items of personal property in the plant, the second part limited to the issue of highest and best use, and the third part limited to the issue of value. I previously decided the issue of the taxability of personal property in General Motors Corp. v. City of Linden, supra, 20 N.J.Tax 242. I now address the highest and best use issue.
In remanding plaintiffs tax year 1983, 1984 and 1985 appeals to the Tax Court, the Appellate Division held as follows as to highest and best use:
As we understand the Supreme Court’s point [in Ford Motor Co. v. Edison Tp., 127 N.J. 290, 604 A.2d 580 (1992) ], the special-purpose classification [of a property] effectively excludes the availability of comparable sales because it effectively excludes the possibility of a market for the property. Identification of highest and best use, on the other hand, defines the market, thereby delineating the class of comparables. The more narrowly defined highest and best use is, the narrower the relevant market. But even if narrowly defined, there is, at least presumptively, some market from whieh usable data can be culled. The problem here is that the special-purpose characterization relied on by the trial judge foreclosed the possibility of any market, other than congruent auto-assembly plant transactions, which could supply relevant sales data. We do not here undertake to define the appropriate market in this case. The Tax Court has special expertise in these matters. It is best able to do so by reconsidering, in the light of Ford Motor, not only this record but such supplementary proofs as the parties may wish to offer. [General Motors Corp. v. City of Linden, supra, 13 N.J.Tax at 327.]
Pursuant to this ruling, I entered an Order providing that the highest and best use of the subject property cannot be defined “so narrowly that it precludes analysis of value based on market data.”[2]
I hold that the highest and best use of the subject property for each year under appeal was its existing use as an automobile assembly plant. In so doing and in making the factual and legal *104 findings and conclusions contained in this opinion, upon which my holding is based, I have considered the following: (1) the testimony and documentary evidence presented during the trial of the highest and best use issue and, to the extent relevant, the testimony and documentary evidence presented during the trial of the taxability of personal property issue; (2) those portions of the transcript and exhibits from the tax years 1983-1985 trial designated by counsel; (3) the credibility of the witnesses, the degree of support for opinions rendered by expert witnesses, and the weight to be accorded the testimony of each witness; (4) the Appellate Division’s rulings on highest and best use contained in its remand opinion, General Motors Corp. v. City of Linden, supra, 13 N.J.Tax 324; and (5) the post-trial submissions of counsel.
My holding derives fundamental support from (a) the public policy, repeatedly invoked by our courts, of fairly and equitably distributing the property tax burden and (b) the undisputed evidence that the special features of the subject building and the taxable equipment it contained, all relating to automobile assembly use, have their greatest value for that use. The holding has the following three analytical bases:
1) The Hypothetical Market (Section VII, Subsections B and C below) — even if an actual market for the property as an automobile assembly plant was unlikely to have existed as of each of the assessing dates in issue, a hypothetical market can and should be deemed to have existed for that use, containing a purchaser or purchasers whose needs would have been reasonably accommodated by the property in its existing condition (including all special building features and taxable equipment relating to automobile assembly use);
2) The Actual Market (Section VII, Subsection D below) — a limited actual market for the property as an automobile assembly plant existed as of each of the assessing dates in issue; and
3) Failure of Proof (Section IX below) — plaintiff failed to prove that a use other than the existing automobile assembly use of the property was its highest and best use.
As explained in the next paragraph, my holding is not equivalent to categorizing the subject property as a special purpose facility. Therefore, the holding is in compliance with (1) our Supreme Court’s Ford Motor Co. opinion, (2) the discussion and directives as to highest and best use contained in the Appellate Division’s *105 remand opinion, and (3) the Order I entered based on the remand opinion.
The Tax Court in Ford Motor Co. ruled that the highest and best use of Ford’s property was as an automobile assembly plant, but considered sales of other industrial facilities for purposes of determining value. Ford Motor Co. v. Edison Tp., 10 N.J.Tax 153 (Tax 1988), aff'd, 12 N.J.Tax 244 (App.Div.1990), aff'd, 127 N.J. 290, 604 A.2d 580 (1992). The Supreme Court construed the Tax Court’s approach as equivalent to finding a highest and best use of “auto assembly or kindred heavy-industrial-type purposes.” Ford Motor Co., supra, 127 N.J. at 303, 604 A.2d 580. Here, as in Ford Motor Co., my holding that the highest and best use of plaintiffs property is as an automobile assembly plant will not restrict my consideration of the market to “congruent auto-assembly plant transactions,” General Motors Corp. v. City of Linden, supra, 13 N.J.Tax at 327, and will not preclude my consideration of data from the market relating to sales or leases of “kindred heavy-industrial-type” properties for purposes of valuing the subject property. As in any other tax appeal, the probative value of any market data will be a function of the degree of similarity between the comparable sales or leases and the subject property and the reliability of any adjustments made by the appraiser using the data. My determination of highest and best use also will not preclude consideration of the cost approach because that approach reflects market behavior. See International Flavors & Fragrances, Inc. v. Union Beach Bor., 21 N.J.Tax 403, 445 (Tax 2004) (concluding that the cost approach is a market approach).
II.
The Subject Property
The subject property has been used as an automobile assembly plant almost continuously since completion of construction of the original building in 1937. During World War II, the property was used to manufacture military airplanes and tanks. Automobile assembly operations resumed in or about 1945 and have continued *106 since that date, without interruption, through all years under appeal and thereafter. The parties agree that the use of the subject property as an automobile assembly facility complied with applicable zoning ordinances during all years under appeal.
The land included in the subject property during the years under appeal varied in size from 92.333 acres during the period 1983 through 1986, to 102.033 acres during the period 1987 to 1997 (augmented by approximately ten adjacent acres purchased by plaintiff from Gordon’s Distillery), to 99.533 acres during the period 1998 through 2003 (decreased by the two and one-half acres transferred to be used for construction of a cogeneration facility). The buildings included in the subject property have consisted of a large main building and smaller accessory buildings, the aggregate size of which has varied as follows:
(a) 1983 through 1985 — 2,396,770 square feet (main building — 2,077,770 square feet; accessory buildings — 319,000 square feet);
(b) 1986 — 2,585,825 square feet (main building — 2,266,825 square feet; accessory buildings — 319,000 square feet);
(c) 1987 through 1993 — 2,704,702 square feet (main building — 2,332,782 square feet; accessory buildings — 371,920 square feet);
(d) 1994 through 1998 — 2,643,313 square feet (main building — 2,365,263 square feet; accessory buildings — 278,050 square feet);
(e) 1999 — 2,656,369 square feet (main building — 2,365,263 square feet; accessory buildings — 291,106 square feet);
(f) 2000 — 2,638,269 square feet (main building — 2,365,263 square feet; accessory buildings — 273,006 square feet); and
(g) 2001 through 2003 — 2,668,093 square feet (main building — 2,365,263 square feet; accessory buildings — 302,830 square feet).
As described in detail in my opinion in General Motors Corp. v. City of Linden, supra, 20 N.J.Tax 242, the subject property includes significant amounts of equipment designed for use in plaintiffs automobile assembly operations, much of which I determined was subject to property tax. In addition to this equipment, the main building contains other features specifically related to its automobile assembly use, namely reinforced steel trusses and a very large electrical capacity.
*107 III.
The Definition of Highest and Best Use
Highest and best use is a fundamental element in the valuation of property.
The concept of highest and best use is not only fundamental to valuation but is a crucial determinant of market value. This is why it is the first and most important step in the valuation process. The highest and best use for the subject property is that use which at the time of the appraisal (here, the appropriate assessment dates) is the most profitable likely use or produces the highest property value.
[Ford Motor Co. v. Edison Tp., supra, 10 N.J.Tax at 161(citations omitted).]
“[Highest and best use can be described as the foundation on which market value rests.” The Appraisal of Real Estate, supra, at 305.
The definition of highest and best use contained in The Appraisal of Real Estate, a text frequently used by this court and our appellate courts as a source of basic appraisal principles, has remained relatively constant for all of the years under appeal. The seventh edition of the text, published in 1978, defined highest and best use with respect to improved properties as follows:
The basic concept — highest and best use is the available use or program of future utilization that produces the highest present value as applied to land — is similarly applicable in the analysis of improved properties. The appraiser considers alternate use possibilities leading to selection of the program of use that best meets the objective of the concept.
[American Institute of Real Estate Appraisers, The Appraisal of Real Estate 45 (7th ed.1978).]
The eighth edition of The Appraisal of Real Estate defined highest and best use as “[t]he reasonable and probable use that supports the highest present value, as defined, as of the date of the appraisal,” American Institute of Real Estate Appraisers, The Appraisal of Real Estate 244 (8th ed.1983), or, alternately as: “The use, from among reasonably probable and legal alternative uses, found to be physically possible, appropriately supported, financially feasible, and that results in the highest present land value.” Ibid. The ninth edition of the text modified the definition somewhat so that it applied to vacant land and to improved properties. The revised definition was: “The reasonably probable and legal use of vacant land or an improved property, which is *108 physically possible, appropriately supported, financially feasible, and that results in the highest value.” American Institute of Real Estate Appraisers, The Appraisal of Real Estate 269 (9th ed.1987). This definition was unchanged in the tenth edition, Appraisal Institute, The Appraisal of Real Estate 275 (10th ed.1992),[3] the eleventh edition, Appraisal Institute, The Appraisal of Real Estate 297 (11th ed.1996), and in the twelfth edition which is the most recent version of the text. Appraisal Institute, The Appraisal of Real Estate, 305 (12th ed.2001).[4]
Highest and best use analysis requires sequential consideration of the following four criteria: (1) whether the use is physically possible; (2) whether the use is legally permitted;[5] (3) whether the use is financially feasible; and (4) whether the use is maximally productive. The Appraisal of Real Estate, supra, at 307. In the appeals before me, the dispute between the parties relates to criteria (3) and (4). The parties agree that the respective highest and best uses asserted by them are physically possible and legally permissible for each year under appeal. Plaintiff asserts that, for tax years 1983 through 1989, the highest and best use of the subject property was as a “single occupant manufacturing utilization with related offices and warehousing services____The assembly of automobiles is one category of occupancy that matches this observation but does not represent the sole use for which the subject is adaptable.” For tax years 1990 through 2003, plaintiff contends that continued use of the property as an automobile assembly facility was neither financially feasible nor maximally productive and that the highest and best use of the property was for “single or multiple occupant manufacturing, warehousing, distribution, and/or wholesale trade.” Defendant asserts that use of the subject property as an automobile assembly plant was one of *109 several financially feasible uses and the maximally productive use for each year under appeal, and therefore, that use as an automobile assembly plant was the highest and best use of the property for all years under appeal.
Plaintiff presented the testimony and reports of five expert witnesses in support of its position as to highest and best use. Four of these witnesses (including one from the trial of the 1983-1985 appeals) provided background for the opinion as to highest and best use rendered by plaintiffs fifth expert, its appraiser. Plaintiff also presented one expert rebuttal witness as to appraisal theory. Defendant presented the testimony of two appraisers, one of whom testified only as to the theory of highest and best use analysis as applied to the subject property, and a third witness who testified as to air pollution laws and permits. In addition, defendant relied on specific portions of the direct and cross-examination of witnesses and specific exhibits from the trial of the 1983-1985 appeals.
IV.
Plaintiffs Proofs
Plaintiffs four background witnesses had the following respective areas of expertise: planning and design of large industrial facilities, including automobile assembly plants; selection of site locations for large industrial facilities; marketing and manufacturing strategies for large industrial corporations, including automobile manufacturers; and industrial real estate brokerage. Based on (a) the testimony, on direct and cross-examination, of these witnesses and plaintiffs appraiser, (b) the witnesses’ and appraiser’s respective written reports, and (c) related exhibits, I find and conclude that plaintiffs proofs established the following for the entire period 1983 through 2003.[6]
1) The land area of the subject property, approximately 100 acres, was small relative to the size of sites used for new automobile assembly plants. These sites *110 generally contained well in excess of 200 acres, and often in excess of 400 acres. However, at least some of the new plants similar in size to the subject plant used only approximately 100 acres of those larger sites.
2) The size of the subject plant, ranging from approximately 2,400,000 square feet to approximately 2,700,000 square feet, was consistent with the size of new plants.
3) The subject site may not have been large enough to install a contiguous stamping plant (to stamp sheet metal parts), but such a plant was not an essential component of modern automobile assembly plants.
4) In 1985 plaintiff acquired from Gordon’s Distillery approximately ten acres adjacent to the then subject land, but elected not to acquire other parcels of adjacent land, aggregating ten to fifteen acres, that later became available. This indicates that plaintiff regarded the size of the subject site as adequate.
5) The taxable equipment installed in the subject plant specifically for automobile assembly use satisfied current standards for such equipment.
6) The electrical capacity at the plant was far in excess of that required for other manufacturing operations, and the load-bearing capacity of the steel trusses in approximately 40% of the area of the main building (nearly 900,000 square feet) was four times the load-bearing capacity found in most industrial facilities.
7) The taxable equipment installed in the subject plant, the plant’s electrical capacity, and the increased load-bearing capacity of the steel trusses have little if any value for any use other than for automobile assembly purposes.
8) The strong trend in location of new automobile assembly plants has been toward the so-called industrial diamond or automobile corridor consisting generally of Michigan, Ohio, Indiana, Illinois, Kentucky, and Tennessee. Many component parts manufacturers and suppliers have followed the assembly industry and moved to the same area.
9) Freight costs for shipping parts and supplies from the automobile corridor to New England or the Middle Atlantic states were substantially lower than freight costs to the West Coast.
10) No new automobile assembly plants have been constructed in New England or the Middle Atlantic states, and, except for one plant in Pennsylvania, plants in those states that closed were not sold for continued automobile assembly use.
11) (a) Throughout the United States, closed automobile assembly plants have not been sold on an individual basis for continuing use as such, with the exception of (i) a plant in Fremont, California owned by plaintiff and contributed in 1986 to a joint venture with Toyota known as New United Motor Manufacturing, Inc. (NUMMI); (ii) a plant in Sterling Heights, Michigan acquired by Volkswagen in 1983 from a missile manufacturer and sold in 1983 to Chrysler Corporation which commenced assembly operations in 1984; and (iii) a plant constructed by Chrysler Corporation in New Stanton, Pennsylvania and sold to Volkswagen in 1978. The Sterling Heights and New Stanton plants are no longer used for automobile assembly.
(b) In addition to the foregoing sales, automobile manufacturers merged with or acquired other manufacturers with existing assembly plants continuing in the same use after the merger or acquisition. Examples of these transactions were *111 Chrysler Corporation’s acquisition of American Motors Corporation in 1987 and the merger of Chrysler and Daimler Benz to form Daimler-Chrysler in 1998.
12) In 1980, Ford Motor Company sold an assembly plant in Pico Rivera, California to Northrop Corporation to be used for the manufacture of military aircraft.
13) Automobile manufacturers, domestic and foreign, have preferred to locate in states that have right-to-work laws (laws that prevent “labor-management agreements requiring a person to join a union as a condition of employment,” Black’s Law Dictionary 1352 (8th ed.2004)), low wage levels, and provide substantial financial incentives. New Jersey did not satisfy any of these criteria. However, the agreements between the United Auto Workers union and manufacturers such as plaintiff, Ford Motor Company, and Daimler-Chrysler were applicable throughout the United States, and therefore, those manufacturers did not realize labor cost savings when locating plants in the automobile corridor or elsewhere.
14) A structural shift in the domestic automobile assembly industry occurred after 1979 when imports began to capture a large share of the domestic market. In order to compete, domestic manufacturers had to adopt Japanese manufacturing methods, particularly the “just-in-time” method, where component parts were delivered as needed on the production line and not stored in large quantities at the plant. As a result of this change in manufacturing methods, formerly satisfactory plant sites became unsatisfactory because they were unsuitable for the just-in-time methodology. As described by plaintiffs marketing and manufacturing strategies expert, domestic automobile manufacturers “had to sit down and say, yes, our production facilities and our manufacturing systems are just not competitive and we need to do something radical and that means that we’re going to close plants and we’re going to make permanent changes in the way we do business.”
15) There was an active market in New Jersey and nationally for large industrial manufacturing buildings, but the buildings usually did not sell for continuing manufacturing use, particularly the same use, except as the result of a merger or corporate acquisition.
16) Possible alternate uses for the subject property were: (a) manufacture of automobile power trains, automotive components, heavy equipment, major appliances, electrical equipment, or electronics equipment; (b) general purpose metal fabrication; and (c) warehouse. For any of these uses, three major items of taxable equipment at the subject property (paint booths, paint ovens, and makeup air houses) would have had no utility or value, and only relatively small portions of the conveyors, compressed air piping, some process piping, the weld water system (although having a cooling capacity in excess of that required), and the electrical distribution system (although having a capacity in excess of that required) would have had any continuing utility. Almost none of the taxable equipment would have had any utility for a warehouse use.
17) The cost of removal of the taxable equipment from the subject plant would have been up to approximately $10 per square foot of plant area, or approximately $25,000,000.
18) Plaintiff installed the taxable equipment in the subject plant for its use and without any concern about recovering any portion of the cost of the equipment upon sale of the plant.
*112 19) The paint booths, paint ovens, make-up air houses and other items of taxable equipment would have had utility for another automobile manufacturer although modifications would have been required. I reject the opinion of plaintiffs planning and design expert that the taxable paint shop equipment in the subject plant (booths, ovens, and make-up air houses) would not have had utility because the equipment was located on the second-floor of the plant, and second-floor paint-shops were outdated. The evidence demonstrated that, in 1982, Honda installed a second-floor paint shop in its new Morganville, Ohio plant, that a substantial number of older plants that remained in operation had second floor paint shops, and that even one-story assembly plants generally had the paint shop elevated on a mezzanine.
I also reject the testimony of plaintiffs planning and design expert that the paint shop equipment in the subject plant was obsolete because it used a solvent-based paint system and not a more modern waterborne system. The evidence demonstrated that, in 1985, 1986, 1987, 1989, 1992 and 2001, plaintiff installed new solvent-based paint systems in plants other than the subject plant, and that, throughout the 1980’s, Honda, Nissan, and other automobile manufacturers installed solvent-based paint systems. The evidence also demonstrated that the paint booths, ovens, and make-up air houses at the subject plant could have been converted for use in a waterborne system (although cooling capacity would have had to be added to the make-up air units) and that at least some of the paint booths, including the main color booth, were constructed of stainless steel, the preferred material for waterborne paint systems.
20) Twenty-five new automobile assembly plants opened in the United States (twenty-two between October 1, 1982 and October 1, 2002), including seven opened by plaintiff.
21) In 2003, three of the twenty-nine plants underwent major expansions;
22) twenty assembly plants in the United States closed, including fifteen closed by plaintiff.
23) The percentage of automobile assembly plants on the East Coast of the United States that closed was approximately the same as the percentage of plants in the automobile corridor that closed.
24) Almost 17% of the population of the United States, approximately 48,000,000 people, was located within a two hundred mile radius of the subject property, and almost 3% of the population, approximately 8,000,000 people, was located within a twenty mile radius.
Plaintiffs appraiser relied on the written reports and direct testimony of plaintiffs background witnesses and concluded that the highest and best use of the subject property, as vacant, was for “industrial utilization in accordance with the underlying zoning.” In connection with this opinion, the appraiser also determined that “the subject site could not physically accommodate an assembly plant laid out to meet modern standards” and that “it is unreasonable to assume that the subject land would be acquired for development with a light vehicle assembly plant if it were a *113 vacant tract on each valuation date.” For the subject property, as improved, the appraiser reached different conclusions for different periods of years. For tax years 1983 through 1989, he concluded that the highest and best use was as a “single occupant manufacturing utilization with related offices and warehousing services” with “assembly of automobiles” as one category within the general highest and best use but not constituting the sole use for which the property was “adaptable.” For tax years 1990 through 2003, he concluded that the highest and best use was for “single or multiple occupant manufacturing, warehousing, distribution and/or wholesale trade.”
The appraiser set forth in his report and in his testimony an extensive analysis of why, in his opinion, use as an automobile assembly facility was not the highest and best use of the subject property and why the property would not be sold in the market for continued manufacturing of automobiles. His reasons, in summary, were as follows:
1) no new automobile assembly plant had been constructed in the northeastern United States since 1978;
2) no existing assembly plant had been purchased for continued assembly plant use since 1984 except for the Chrysler plant in Sterling Heights, Michigan and except where an assembly plant was linked to a component parts manufacturing facility;
3) all new automobile assembly plants in the United States built since 1976, with the exception of the Chrysler-Volkswagen plant in New Stanton, Pennsylvania, and a BMW plant in South Carolina, were built in the automobile corridor and component suppliers have moved towards this same geographic area;
4) plaintiffs continued use of the subject facility most likely was motivated by the necessity to provide product, unavailable from other plants, to satisfy market demand and did not demonstrate that the optimum utility of the facility was as an automobile assembly plant;
5) there was no objective evidence of any market demand for the taxable equipment at the subject facility;
6) it would be “very difficult” to induce an automobile manufacturer to locate on a site the size of the subject land; and
7) the availability to an automobile manufacturer of the taxable equipment at the subject property would not be sufficiently advantageous to overcome the other negative characteristics of the property.
*114 V.
Defendant’s Proofs
Defendant’s primary witness as to highest and best use was its appraisal expert who had valued the subject property in connection with the 1983-1985 trial and was fully familiar with the physical details of the property for each year under appeal. The witness concluded that, although other uses of the property were possible (but unlikely), continued use as an automobile assembly facility was the property’s highest and best use. In reaching this conclusion, the appraiser acknowledged that, if the property were placed on the market for sale, purchase by another automobile manufacturer would be unlikely except in the context of a merger or acquisition, that is, purchase of the plant as part of a going concern. He further acknowledged that, if the property were vacated by plaintiff prior to sale, the most likely use by a purchaser would be for retail development after demolition of the subject plant.
In support of his highest and best use determination, the appraiser cited the special features of the property for automobile assembly use, including reinforced structural steel to carry the heavy loads involved in automobile assembly, large electrical capacity, and the specialized taxable equipment. He concurred with plaintiff’s witnesses that these features had little or no value for any use of the subject property other than for automobile assembly purposes. The appraiser also cited the following in support of his highest and best use determination: (1) plaintiffs continuous and continuing use of the subject property for automobile assembly from the mid-1940’s through 2003 and thereafter; and 2) plaintiff’s periodic refitting, retooling, renovation, expansion, and modification of the subject plant to enable it to manufacture several different models of automobiles and light trucks of different sizes and using different chassis configurations (the E-K Car model — Buicks, Cadillacs and Oldsmobiles — from 1978-1985; the L Car model — Chevrolet Corsicas and Berrettas — from 1986-1992; and the ST Truck model — Chevrolet S10 Pick-Ups and Blazers, GMC and Sonoma Pick-Ups, and Jimmy SUV’s — from *115 1993 to date), including the following significant investments totaling almost $590,000,000:
(a) expansion of the plant by 84,200 square feet in 1977 and a retooling in connection with a model changeover at an aggregate cost of approximately $39,100,000;
(b) a model changeover and retooling in 1984-1985 at an aggregate cost of $297,637,000;
(c) a $2,580,000 purchase price of additional land in 1985;
(d) a model changeover and retooling in 1993-1994 at a cost of $196,292,000;
(e) construction of a new stacker facility in 1997-1998 at a cost of approximately $8,000,000; and
(f) a 24,000 square foot addition to the building in 2000 at a cost of $45,000,000 including some non-realty items.
In addition, as discussed below, in 1996 plaintiff entered into a fifteen year agreement to purchase its electricity and steam from a cogeneration facility to be built specifically to supply plaintiffs requirements.
The appraiser cited the following as evidence of market demand for the subject property as an automobile assembly facility: the sale of the Sterling Heights plant; plaintiffs NUMMI joint venture with Toyota; the acquisition by Chrysler Corporation of American Motors Corporation and its plants; the merger of Chrysler and Daimler Benz to form Daimler-Chrysler; the acquisition by other automobile manufacturers of the business and plants of competitors; mergers between other automobile manufacturers; the continued operation of numerous assembly plants throughout the United States and the construction of many new plants; and the continuing demand for the automobiles assembled at the subject plant.
Defendant’s second witness (“defendant’s theory witness”) also was an appraisal expert. This expert had appraised one automobile assembly plant, acted as a consultant on the appraisal of another and had inspected eight assembly plants in addition to the subject plant. The witness was not familiar with the details of the physical aspects of the subject property other than as described by defendant’s appraiser. Defendant’s theory witness concluded that, because the subject facility was a viable automobile assembly plant throughout all of the years under appeal, its highest and *116 best use was for automobile assembly purposes, even though the property could be converted to an alternate use. The witness opined as follows:
Industrial manufacturing plants with special features to perform particular tasks, which plants are viable, operational and functional for these tasks generally have a highest and best use for the continuation of these uses.
Industrial manufacturing plants which are no longer functional for their intended obsolete use, have a highest and best use only for some alternate-use____And, while alternate use sales are relevant to the value of the non-viable plant, these dangling wire, abandoned plants obviously are not competitive or sell in the same market as viable plants.
The witness also opined that the retrofitting of the plant in connection with model changes demonstrated “the basic flexibility and adaptability of the property for the same use of auto and truck assembly or kindred use.” He noted the following factors which demonstrated that the highest and best use of the property was for its existing use: (1) the property’s special physical features such as reinforced structural steel construction; (2) the items of specialized automobile assembly equipment deemed to be a real property; (3) the configuration of the plant; and (4) the plant’s flexibility for conversion to other types of automobile manufacture. He also noted that the plant had a long history of use for vehicle assembly, had a skilled workforce available with a history of good labor relations, had never been considered for closing by General Motors, and had been selected to produce new models over the course of the years under appeal. The witness concluded that, if the subject property were on the market for sale during any year under appeal with no restrictions on its use as an automobile assembly facility, “other automotive companies, both domestic and international, may have been interested.”
Defendant’s theory witness noted that, if the subject plant were converted to another use, the cost of conversion would be significant. In addition, conversion to a different use would cause a loss of the value of the existing reinforced structural steel as well as the taxable equipment. The witness testified that the subject building does not have appropriate loading and unloading facilities for warehouse use, installation of which would be costly, and that the layout of the building is not particularly suited for storage and *117 distribution. Similar factors would affect the suitability of the plant for multi-occupant industrial use, with the second floor being a negative because most users would find such space to be nonfunctional. In general, the witness considered these alternate uses to be not as valuable as continued use of the subject property as an automobile assembly plant.
The Linden plant has been and continues to be productively and fully utilized for the purposes for which it was designed and constructed. That use is a viable and healthy use. That use is therefore presumed to be the highest and best use— [I]t is misleading, in my opinion, to opine that the highest and best use is a generic industrial category.
Defendant also presented an expert in the obtaining of environmental permits under statutes and regulations relating to the New Jersey Department of Environmental Protection and the United States Environmental Protection Agency. This witness testified that the subject property was in compliance with air pollution regulations, that its certificates, including those which pertained to solvent-based paint operations, were renewed in May 2003 and will continue in effect through 2008, with another certificate expiring in 2004. The witness stated that a new owner of the facility would benefit from the upgrades installed by plaintiff in order to comply with applicable air pollution regulations and that the new owner would be able to continue to operate under the certificates issued to plaintiff, subject to filing the necessary notification of change in ownership with the New Jersey Department of Environmental Protection and the United States Environmental Protection Agency.
VI.
Plaintiffs Rebuttal Proofs
By way of rebuttal, plaintiff presented the testimony of another appraiser (“plaintiffs theory witness”) who made no study of the physical aspects of the subject property but merely examined, from a theoretical perspective, the analysis of highest and best use by both of defendant’s appraisers. His testimony was based on (1) the twelfth edition of The Appraisal of Real Estate, particularly the discussion of the importance of and necessity for a market *118 and marketability analysis as a basis for determining highest and best use, id. at 269-303, and (2) written materials from the Appraisal Institute’s Course 520 entitled “Highest & Best Use and Market Analysis.” Market and marketability analysis, as described in these texts and by the witness, involves the following six sequential steps: property productivity analysis; market delineation; demand analysis and forecast; competitive supply analysis and forecast; supply and demand study; and capture estimation. See The Appraisal of Real Estate, supra, at 286. The analysis requires a determination of the several most probable uses for a property, then a determination of the financial feasibility of each probable use, and finally a determination of the maximally productive use.
Adequate support for a reasonably probable, physically possible, and legal use is the first issue addressed in assessing the financial feasibility of a use alternative. Sound judgment on the adequacy of support is based on an analysis of the supply, demand, and equilibrium characteristics of a defined market area and the buying power of identified market participants (market segment). Information from the results of this analysis allows the appraiser to estimate absorption and capture for the subject property at a specified use. For each alternative use, a use-specific demand, supply, and equilibrium analysis is required to provide the basis of absorption and capture estimates for the property at that use.
[Appraisal Institute, Course Handbook for Course 520, Highest & Best Use and Market Analysis 3-16 (1993).]
Physically possible legal uses that are financially feasible are then tested for maximum productivity. The sequence proceeds from the greatest number of reasonably probable uses to the single use that is the highest and best use of the subject property.
[Id. at 3-21.]
Financial feasibility requires that the property value as is must be surpassed by the value of the property after conversion, renovation, or alteration (CRA) less the costs of CRA.
[Id. at 3-24.]
Plaintiffs theory witness concluded that the analyses of highest and best use by defendant’s witnesses did not include appropriate market and marketability analyses and, therefore, were unreliable.
Neither [appraiser] has demonstrated in their [sic] respective reports that they [sic] have undertaken the analysis necessary to reach a credible conclusion of the highest and best use for the subject property. Neither undertakes the supply and demand analysis needed to reach a defensible conclusion of the reasonably probable use for the property, assuming a transaction.
*119 VII.
Analysis
A. The Definition of Market Value
Highest and best use and value are related concepts, because, as discussed above, highest and best use establishes the basis for determining value. The standard of value for tax assessment purposes in New Jersey is established by N.J.S.A. 54:4-23, which requires a municipal tax assessor to “determine the full and fair value of each parcel of real property situate in the taxing district at such price as, in his judgment, it would sell for at a fair and bona fide sale by private contract on October 1 next preceding the date on which the assessor shall complete his assessments, as hereinafter required----” N.J.S.A. 54:4-23. “Full and fair value” generally has been equated with fair market value or market value. In Ford Motor Co., supra, 127 N.J. 290, 604 A.2d 580, our Supreme Court described the applicability of the market value standard to property tax assessment as follows:
All real property must be assessed at true value. In New Jersey, the concept of true value has been expressed in terms of the price that could be obtained for the property in money at a fair sale between a willing buyer and a willing seller. In the ease of certain properties, conventional market theories are not readily adaptable. [C]ourts of this state have long recognized that for certain types of unique property that were constructed for a special purpose and are only suited for that particular purpose, the market and income approaches to value are not applicable.
[Id. at 298-99, 604 A.2d 580 (citations omitted).]
As defined in The Appraisal of Real Estate, “market value” is
The most probable price, as of a specified date, in cash, or in terms equivalent to cash, or in other precisely revealed terms, for which the specified property rights should sell after reasonable exposure in a competitive market under all conditions requisite to a fair sale, with the buyer and seller each acting prudently, knowledgeably, and for self-interest, and assuming that neither is under undue duress.
[The Appraisal of Real Estate, supra, at 22.]
The same definition also appears in the eleventh (at page 22), tenth (at page 20) and ninth (at page 19) editions of the text and a virtually identical definition appears in the eighth (at page 33) and seventh (at page 23) editions.
The legal basis for plaintiffs position as to highest and best use is primarily the discussion in Ford Motor Co. of the relationship *120 between market value and highest and best use, There, our Supreme Court cited the definition of highest and best use in the seventh edition of The Appraisal of Real Estate, and added the following comments:
A concomitant of a highest and best use, however, is that consideration of the use has as a prerequisite a probability of achievement. The projected use cannot be remote, speculative or conjectural____
Property valuation at highest and best use, then, requires the appraisal of each parcel as though it were being put to its most profitable use, given probable legal, physical and financial constraints. It simply implements a market value standard identifying highest and best use by reference to prices bid for the property in light of all of its possible legal uses.
[Id. at 301, 604 A.2d 580 (citations and internal quotation marks omitted).]
The Court concluded as follows:
Only the “market driven” value in exchange, not the value in use to Ford, should identify the highest and best use of the property. (Obviously there are situations in which the relationship between cost and market will not always determine value. A wise judge noted long ago: “If this be not so, a citizen, by the erection of a residence so costly that no one could buy it, would escape all taxation, which is obviously not the intent of the Legislature or the proper interpretation of its statute.” Turnley v. City of Elizabeth, 76 N.J.L. 42, 44, 68 A. 1094 (Sup.Ct.1908).) [Id. at 302-303, 604 A.2d 580.]
As the above quotation concerning the definition of market value states, for certain properties, “conventional market theories are not readily adaptable.” Ford Motor Co., supra, at 299, 604 A.2d 580. Although immediately after this statement the Court refers to “unique” or “special purpose” properties, case law demonstrates that, in the property tax appeal context, when determining either market value or highest and best use, our Supreme Court and other New Jersey courts have deviated from conventional market theories in order to define the marketplace in a manner consistent with the policy objective of fair and equitable distribution of the property tax burden. The following are examples of this approach:
1) In the marketplace, the sales price for a property sold subject to a long term lease would be influenced by the rental payable under the lease. For property tax assessment purposes, however, the actual terms of the lease are disregarded and the property is assessed as if it were leased at the market rental prevailing on the applicable assessment date. In New Brunswick v. State Div. of Tax Appeals, 39 N.J. 537 [189 A.2d 702] (1963), our Supreme Court stated as follows: True, the value of a parcel of property may in fact be affected;by the prudence or imprudence of its owner, and so a long-term lease for an unfavorable rent will *121 impair the selling price, just as a long-term lease to a triple-A tenant at a high rental may make the property more attractive to a buyer. But the valuations of properties for local taxation cannot vary with the managerial successes or failure of the owners.
[Id. at 544, 189 A.2d 702.]
See also Town of Irvington v. 1125-1127 Clinton Ave. Assocs., 5 N.J.Tax 420 (Tax 1983) (stating that “the selling price of real property will reflect the burden of long-term leases disadvantageous to the landlord____” and holding that such a selling price does not establish value for tax assessment purposes. Id. at 430-31.).
2) The marketplace would discount the sales price of a newly constructed rental property, such as an office building, retail shopping center, or apartment complex, for the anticipated time period necessary to attain a stabilized occupancy percentage. See, The Appraisal of Real Estate, supra, at 500. For property tax assessment purposes, however, the lease-up period is disregarded and the property is treated as if it were leased at market occupancy levels as of the assessment date. MSGW Real Estate Fund, LLC v. Mountain Lakes Bor., 18 N.J.Tax 364, 397 (Tax 1998).
3) In using an income approach to value property, the marketplace will incorporate a vacancy and collection loss allowance based on a property’s recent history and current market conditions, and will use a capitalization rate based on current market conditions. For property tax assessment purposes, however, those percentages will be stabilized, and the court will disregard a significant increase or decrease in either percentage attributable to what the court regards as transient or temporary economic conditions. New Brunswick v. State Div. of Tax Appeals, supra, at 39 N.J. at 550 [189 A.2d 702] (“It is not feasible for an assessor to adjust the [property tax assessment] rolls to the fluctuations of the mortgage market ...”); East Orange v. Livingston Tp., 103 N.J.Super. 109, 117 [246 A.2d 722] (App.Div.1968) (“[A]s a practical matter there must be stability in assessments and ... values for purposes of taxation should possess a measure of permanency which render them secure against general temporary inflation or deflation.”) See also University Plaza Realty Corp. v. Hackensack, 12 N.J.Tax 354, 369 (Tax 1992), aff'd, 264 N.J.Super. 353 [624 A.2d 1000] (App.Div.), certif. denied, 134 N.J. 481 [634 A.2d 527] (1993) (“[A] vacancy allowance must be predicated on an estimate of the long-term quality and durability of the rental income stream.”).
4) In tax appeals that were filed during the 1930’s when, as a result of the Depression, properties could not sell, taxpayers contended that their properties had no market value, but our courts disregarded what they described as temporary economic conditions and determined a market value for properties which, in fact, had no value in exchange at the time. Colonial Life Ins. Co. of Am. v. State Board of Tax Appeals, 126 N.J.L. 126, 129 [18 A.2d 625] (Sup.Ct. 1941). (“The fact that the property, due to abnormal conditions, is not salable on the assessment date [ (October 1, 1937) ] is not conclusive of the issue [of the proper assessment amount].”).
5) In determining the price for property containing environmental contamination requiring clean-up, a purchaser will likely deduct from an “as clean” price the dollar-for-dollar anticipated clean-up cost. For property tax assessment pur *122 poses, however, a dollar-for-dollar deduction is not permitted. Inmar Assocs. v. Carlstadt Bor., 112 N.J. 593 [549 A.2d 38] (1988).
B. The Hypothetical Market — Ford Motor Co. v. Edison Township and Preceding and Subsequent Decisions
Express judicial recognition that, in some circumstances, “market value” for property tax purposes involves special considerations, and that those considerations affect the determination of “highest and best use,” first appears in Turnley v. City of Elizabeth, 76 N.J.L. 42, 68 A. 1094 (Sup.Ct.1908). This decision, and other decisions which preceded Ford Motor Co., provide essential background for interpreting that decision. In Tumley, the court stated as follows:
[P]roseeutor has incorporated into the construction of his residence a number of features and fancies that, while adding greatly to its cost, have added little or nothing to its selling price or market value____We are not disposed, however, to give much force to the argument that, because there are very few actual buyers for so costly a residence, the valuation to be placed upon it under the statutory criterion should be correspondingly depreciated. The criterion established by the statute is a hypothetical sale; hence the buyers therein referred to are hypothetical buyers, not actual and existing purchasers. If this be not so, a citizen by the erection of a residence so costly that no one could buy it would escape all taxation, which is obviously not the intent of the Legislature, or the proper interpretation of its statute. Taxation normally bears some relation both to the degree of protection required by the taxpayer and to his ability to contribute to such public burden, as manifested by the permanent improvement of his real property.
[Id. at 43-44, 68 A. 1094.]
This concept of a hypothetical sale was applied to a newly constructed manufacturing facility consisting of six or seven detached buildings in Royal Mfg. Co. v. Board of Equalization, 76 N.J.L. 402, 70 A. 978 (Sup.Ct.1908), aff'd 78 N.J.L. 337, 74 A. 525 (E. & A.1909). The court rejected an attempt to value the property based on sales of “secondhand factory buildings,” because “no question of disposing of the property as a secondhand factory plant had arisen or seemed likely to arise.” Id. at 406, 70 A. 978. In rejecting the contention that, in order to be marketable, the property should contain one multi-story building, the court described this contention as disregarding “the contingency of a purchaser looking for a one-story plant with detached buildings, ... which he might readily malee over to suit his own purposes.” Id. at 407, 70 A. 978. See also United New Jersey R. & Canal Co. *123 v. State Bd. of Taxes and Assessment, 100 N.J.L. 131, 135, 125 A. 335 (E. & A.1924), aff'd 100 N.J.L. 182, 125 A. 923 (E. & A.1924) (citing Turnley and adopting its language as to a hypothetical sale and hypothetical buyers).
In General Motors Corp. v. State Board of Tax Appeals, 125 N.J.L. 574, 16 A.2d 632 (E. & A.1940), our then highest court used a valuation approach similar to that adopted in Turnley v. City of Elizabeth. At issue was the assessable value of motor vehicle parts used in the subject property in Linden. General Motors contended that the personal property tax assessment on the parts was excessive because they were manufactured for a particular automobile and probably could not be used for any other make of automobile. The Court rejected this argument.
In conclusion, there is no substance whatever to the contention that the personal property assessment was too high because few of the parts were salable. This may be admitted because parts made for one automobile might not be suitable for parts made for a different type of motorcar. The “parts” were not purchased or manufactured to be sold as such. The statute sets the fair market price as a standard of value but that value may be determined by considering the cost to the taxpayer where, as here, the personalty was bought or manufactured to be used to assemble a finished product.
[Id. at 577-78, 16 A.2d 632.]
This standard of a hypothetical sale articulated in Turnley v. City of Elizabeth was the basis for the Appellate Division’s decision in CPC International, Inc. v. Englewood Cliffs Borough, 193 N.J.Super. 261, 473 A.2d 548 (App.Div.), certif. denied, 97 N.J. 578, 483 A.2d 124 (1984). There, the taxpayer appealed the property tax assessment on its corporate headquarters built to its specifications with features the taxpayer contended were functionally obsolete because they would not increase the sales price for the property. These features included an exceptionally large lobby area, terraces, escalators, and an unusually expensive climate control system. The court rejected the taxpayer’s contentions.
Plaintiff maintains that the likelihood of a buyer with requirements comparable to plaintiffs is so remote that the cost of the buildings’ indulgences and special purpose features is not recoverable on the market and was therefore properly adjusted by the Tax Court for functional obsolescence. The argument overlooks two governing propositions. The first is that the sale contemplated as the criterion of market value is a “hypothetical sale; hence, the would-be buyers are hypotheti *124 cal buyers not actual and existing purchasers.” United New Jersey, etc. Co., v. State Board etc., 100 N.J.L. 131, 135, 125 A.2d[A.] 335 (E & A 1924). From the context in which it was made we only understand this reference to a hypothetical buyer to contemplate one whose requirements are reasonably accommodated by the property in question.
The second- governing proposition bears on the intent and purpose of the taxpayer. Its substance is that no reduction fi-om taxable value will be allowed for special purpose characteristics where these were built into the structure by the taxpayer without regard to the recoverability of their costs and the question of their marketable value is not raised by any realistic suggestion that the property is about to be offered for sale.
[Id. at 268-69, 473 A.2d 548.]
Although the language of CPC and the authorities on which it relies is not couched in terms of highest and best use analysis, the concepts of a hypothetical sale and hypothetical buyer are directly relevant to the financially feasible and maximally productive criteria of that analysis. Under CPC, those criteria do not require the existence of an actual likely purchaser in the marketplace. A court will presume that a hypothetical buyer exists “whose requirements are reasonably accommodated by the property in question.” CPC, supra, 193 N.J.Super. at 268, 473 A.2d 548. This approach has been adopted and followed in several New Jersey decisions, either in the context of highest and best use analysis or in the context of determining the appropriate value for property in a tax appeal setting.
In Westinghouse Electric Corp. v. Bloomfield Tp., 9 N.J.Tax 92 (Tax 1985), aff'd o.b., 9 N.J.Tax 108 (App.Div.1986), the court rejected the argument that a Westinghouse factory used to manufacture components for its lamp division should be valued as a multi-tenanted facility for light manufacturing. The taxpayer stressed the “diminishing number of industrial complexes in northern New Jersey, with emphasis on those that had been abandoned for that purpose and were presently being used as multi-tenanted industrial facilities.” Id. at 99. Relying on the CPC analysis, the court held:
The above principles require recognition that the number of elevators, the location of the various manufacturing facilities and headquarters offices, the relationship of office space to manufacturing space, as well as the cafeteria and auditorium, should be considered as pointing toward the continued use of this property as a division *125 headquarters for a manufacturer similar to the Lamp Division. Accepting those principles, it is necessary to disregard many attributes of the subject property which taxpayer’s expert used to diminish its value, i.e., the lack of adequate elevators, the alleged uneconomical multistory buildings and the narrow roads between the buildings, since those shortcomings would relate to the use of the subject property as a multitenanted industrial facility.
[Id. at 100.]
But see WCI-Westinghouse, Inc. v. Edison Tp., 7 N.J.Tax 610, 616-17 (Tax 1985), aff'd o.b., 9 N.J.Tax 86 (App.Div.1986) (where the court, without discussing or even citing CPC, rejected the contention by the defendant that the highest and best use of a manufacturing facility was as a special purpose property satisfying the plaintiffs particular needs because (a) the defendant’s experts conceded the property could be converted to an alternative use without large capital expenditures, and (b) the defendant failed to prove there was “a market of buyers with the exact requirements of plaintiff’).
In Owens-Illinois Glass Co. v. Bridgeton, 8 N.J.Tax 495 (Tax 1986), the taxpayer contended that a glass manufacturing plant should be valued as a multi-tenanted warehouse and distribution complex because (a) the market demand for glass containers was decreasing, (b) the location of the facility was at variance with current standards for the location of glass container manufacturing facilities, and (c) the property lacked adequate area. The plant in question was operating as a glass manufacturing plant as of the relevant valuation date, October 1, 1983, but closed by the end of 1983 or early 1984. The Tax Court rejected the taxpayer’s contentions and held as follows:
The general rule in real property taxation is that property must be valued “in the actual condition in which the owner holds it.” However, this general concept is modified to avoid a disproportionate share of the burden of taxation falling upon the other taxpayers when “its value in that condition is affected by what can be done with the property.” The property should be examined for all possible uses and that use which will yield the highest return should be selected.
Under the facts in this case, the court finds no sound basis for qualifying the general rule and it determines that the subject property’s highest and best use was its existing use. The reality of the actual condition in which plaintiff held this property as of October 1,1983 cannot be overlooked.
[Id. at 501-503 (citations omitted).]
*126 In McGinley Mills, Inc. v. Town of Phillipsburg, 9 N.J.Tax 508 (Tax 1988), the Tax Court found that the highest and best use of a textile manufacturing facility was that use and rejected the contention that the facility should be valued at a highest and best use for general industrial purposes. Similarly, in Brockway Glass Co. v. Freehold Tp., 10 N.J.Tax 356 (Tax 1989), aff'd o.b., 12 N.J.Tax 263 (App.Div.1991), remanded to the Tax Court, 130 N.J. 3, 611 A.2d 643 (1992), the Tax Court refused to value an operating glass manufacturing facility as a multi-tenanted general purpose industrial property. The plaintiff presented evidence that no glass plants had sold for continuing use as such in the United States for sixty years prior to the hearing of the appeal. The court concluded as follows:
The “common sense of the situation” and the dictates of N.J.S.A 54:4-23 require that the valuation of real property result in a fair and reasonable distribution of the local property tax burden of a municipality among its property owners. This is achieved in this case by valuing plaintiffs property as a viable glass container manufacturing plant by the cost approach and not by valuing it as a vacant plant about to be converted to a multi-tenant, general-purpose use.
[Brockway Glass Co., supra, 10 N.J.Tax at 376 (citation omitted).]
Our Supreme Court remanded this matter to the Tax Court for reconsideration in light of the Court’s decision in Ford Motor Co. v. Edison Tp., supra, 127 N.J. 290, 604 A.2d 580. The matter settled after the remand, and therefore, the Tax Court rendered no further decision. Plaintiff argues that the remand constituted, in effect, a reversal of the Tax Court’s analysis. I reject plaintiff’s argument because I interpret the Supreme Court’s remand as requiring only that the Tax Court consider whether its Brockway Glass decision was consistent with Ford Motor Co. I do not interpret the remand as equivalent to a determination that Brock-way Glass was decided incorrectly.
In Ford Motor Co. our Supreme Court directly addressed the issue of the highest and best use of an automobile assembly plant. As described above, the Tax Court had found that the highest and best use of the Ford property was as an automobile assembly plant, but, in analyzing the valuation proofs presented by the parties, considered sales of other industrial properties. Ford Motor Co. v. Edison Tp., supra, 10 N.J.Tax at 167-76. The Tax *127 Court’s willingness to consider these sales was consistent with the agreement of the parties that the property was not a special purpose property. The plaintiff contended that the property had a highest and best use “for general manufacturing purposes with associated warehouse and office for a single user.” Id. at 161. The defendant contended that the highest and best use was as “an automobile assembly plant or like use such as small airplane assembly, track or farm tractor assembly.” Ibid. As the Supreme Court stated, both parties agreed that the property did not “qualify as ‘special purpose property,’ regardless of their disagreement concerning the limits on the market for this property.” Ford Motor Co. v. Edison Tp., supra 127 N.J. at 299, 604 A.2d 580.
A special purpose property is a type of limited-market property, and is defined as “[a] limited-market property with a unique physical design, special construction materials, or a layout that restricts its utility to the use for which it was built; ...” Appraisal Institute, The Dictionary of Real Estate Appraisal 272 (4th ed.2002). A limited-market property is “[a] property that has relatively few potential buyers at a particular time.” Id. at 165. See Coastal Eagle Point Oil Co. v. West Deptford Tp., 13 N.J.Tax 242, 257-58 (Tax 1993), aff'd, 15 N.J.Tax 190 (App.Div.), certif. denied, 143 N.J. 320, 670 A.2d 1061 (1995) (discussing the distinction between a “truly-speeial use property” and a “limited-market property” and citing Glenpointe Associates v. Teaneck Tp., 10 N.J.Tax 380, 388-89 (Tax 1989), aff'd, 12 N.J.Tax 118 (App.Div. 1990), for the proposition that all three approaches to value, that is, sales comparison, income, and cost, should be considered even for a special purpose property because “[t]here is no doctrinaire approach to value”). The most recent edition of the Appraisal of Real Estate describes large manufacturing plants as examples of limited-market properties, id. at 25, and states that they “may be appraised based on their current use or the most likely alternative use,” id. at 26, and that “the highest and best use of a plant currently used for heavy manufacturing is probably continued use for heavy manufacturing.” Id. at 326.
*128 As set forth above, in defining highest and best use in Ford Motor Co., the Supreme Court stated that the use must have a “probability of achievement,” and cannot be “remote, speculative or conjectural.” 127 N.J. at 301, 604 A.2d 580. Plaintiff argues that these statements constitute a rejection of the “hypothetical sale” analysis in CPC International Inc. v. Englewood Cliffs Bor., supra, 193 N.J.Super. at 268-69, 473 A.2d 548, and require that highest and best use be based on the likely actual use in the marketplace. Plaintiff contends that, if placed on the market for sale, the subject property would not sell for continued use as an automobile assembly facility. Defendant acknowledges that a sale for this continued use is unlikely. Based on plaintiffs proofs and the defendant’s acknowledgement of the unlikelihood, but not the impossibility, of a sale for continued automobile assembly use, I find and conclude that, if the subject property were offered for sale, a purchase for continued use as an automobile assembly plant or another “kindred” heavy-manufacturing use is unlikely but possible. This finding and conclusion does not require acceptance of plaintiffs highest and best use contentions.
To some extent, the Supreme Court’s highest and best use analysis in Ford Motor Co. appears to be a result of the Court’s aversion to use of the cost approach. As discussed above and in International Flavors & Fragrances, Inc. v. Union Beach Bor., supra, 21 N.J.Tax at 445, value determined under the cost approach is market value and is so described in The Appraisal of Real Estate. In any event, the selection of the approach or approaches used to value a particular type of property should not control the determination of the property’s highest and best use. See STC Submarine, Inc. v. Department of Revenue, 13 Or.Tax 14, 18, 1994 WL 34941 (Or. T.C.1994), aff'd, 320 Or. 589, 890 P.2d 1370 (1995) (discussing the distinction between highest and best use analysis and valuation).
Just as valuation “should have some relationship to reality,” Hackensack Water Co. v. Old Tappan Bor., 77 N.J. 208, 214, 390 A.2d 122 (1978) (cited for this proposition in Ford Motor Co., supra, 127 N.J. at 302, 604 A.2d 580), so, too, highest and best use *129 analysis, as part of the valuation process, must take into account the reality of the nature of a property and determine the use that will produce the highest value. If the highest value will result from a use for which only a limited or very limited market exists, the court should accept that use as the highest and best use, even if determining value for the use is likely to require reliance on the cost approach as one value indicator.
The cost approach may best reflect how the market operates in those circumstances where other “market” data, that is, comparable sales or leases, are scarce or non-existent. A prospective purchaser of a property will not abandon a transaction because sales or leases of comparable properties are few in number or not available. The purchaser would consider any available comparable sales or leases, but, in accordance with the theory of the cost approach, also would consider the cost of acquiring suitable land, based on comparable land sales, and the cost of constructing a similar facility. The purchaser then would subtract estimated depreciation and obsolescence to determine an appropriate price for the limited market property. In the marketplace, therefore, in the absence of comparable sales or leases, or where only a limited number of sales and leases are comparable, the cost approach becomes the primary approach, or at least one approach, used to determine the market price. To reject categorically the use of the cost approach in these circumstances is to reject what actually occurs in the marketplace. If the cost approach cannot be used to value a limited-market property in a tax appeal proceeding, the choice for a court in deciding the appeal becomes one of determining value based on potentially inadequate or flawed data or simply affirming the assessment. Neither alternative is preferable to a careful, proper use of the cost approach.
I conclude that Ford Motor Co. does not (a) prohibit the use of the cost approach, (b) require that highest and best use analysis be controlled or tainted by concerns over what valuation approaches may be usable for a particular use, (c) reject or disapprove CPC, or (d) mandate that a limited-market property, *130 such as the subject property must be valued for an alternate use. Ford Motor Co. accepts the hypothetical buyer-hypothetical sale analysis of CPC, and, for limited-market properties, permits that analysis to be the basis for determining highest and best use. These conclusions are based on the preceding discussion, the discussion below of decisions subsequent to Ford Motor Co., and the following aspects of our Supreme Court’s decision.
First, I note that the Court did not overrule CPC and cited it for the proposition that, under certain circumstances, the sales comparison and income approaches to value are inapplicable. Ford Motor Co., supra, 127 N.J. at 299, 604 A.2d 580.
Second, the Court cited Inmar Associates v. Carlstadt Bor., supra, 112 N.J. 593, 549 A.2d 38, although not in the highest and best use section of its opinion, and did not disapprove or disavow the Inmar discussion of highest and best use. Ford Motor Co., supra, 127 N.J. at 311, 604 A.2d 580. There the Court considered the issue of the effect on value of environmental contamination in a tax appeal context. Two properties were included in the appeal, one no longer in use and the other continuing in use. With respect to the latter property, the Court commented as follows:
In the South Bound Brook case, even though ECRA might have prevented sale of the property on the assessment date, the property had a distinct “value in use” to the owner so long as the owner continued to operate the facility. Hence, when property is in use, normal assessment techniques will remain an appropriate tool in the appraisal process.
... True value for assessment purposes is based upon hypothetical conditions and not particular sales conditions. CPC International, supra, 193 N.J.Super. at 267-68, 473 A.2d 548.
[Inmar Assocs., supra, 112 N.J. at 607-08, 549 A.2d 38.]
Third, the decisions of the Tax Court, Appellate Division, and Supreme Court in Ford Motor Co. were functions of the record before those courts. That record did not include the extensive proofs presented in this matter as to the taxability of the equipment specifically designed and installed for automobile assembly purposes. The absence of those proofs deprived the Supreme Court of an opportunity to make a specific evaluation of the impact of the automobile assembly equipment in the Ford *131 plant on the plant’s highest and best use. Here, I have made extensive findings as to which items of plaintiffs automobile assembly equipment were subject to property tax under N.J.S.A. 54:4-1 and related statutory provisions. General Motors Corp. v. City of Linden, supra, 20 N. J.Tax 242. Those findings, and the proofs on which they were based, enable me to evaluate the impact of the taxable equipment at the subject property on highest and best use in a manner precluded by the record in Ford Motor Co.
The foregoing interpretation of the Ford Motor Co. highest and best use analysis is consistent with that set forth in several decisions subsequent to Ford Motor Co. In Riegel Products Corp. v. Milford Bor., 13 N.J.Tax 546 (Tax 1994), the Tax Court held that the highest and best use of a paper manufacturing plant was for “heavy manufacturing, paper manufacturing and kindred uses.” Id. at 559-60. The court rejected the taxpayer’s contention that the property’s highest and best use was as a general manufacturing and warehouse facility and rejected, as not comparable, sales of properties purchased for warehouse or multi-tenant use because they did not “provide evidence of value for many of the characteristics of the subject such as the water supply, waste-water treatment facility, inside rail loading, on-site cogeneration facility, heavy floor loads and high ceilings.” Id. at 560. The court expressly adopted the CPC determination that value should be based on a sale to a “ ‘hypothetical buyer ... whose requirements are reasonably accommodated by the property in question.’ ” Id. at 561 (quoting CPC, supra, 193 N.J.Super. at 268, 473 A.2d 548).
In Brae Associates v. Park Ridge Bor., 17 N.J.Tax 187 (Tax 1998), aff'd, 19 N.J.Tax 306 (App.Div.), certif. denied, 170 N.J. 87, 784 A.2d 719 (2001), the Tax Court, based on the CPC analysis, held that the highest and best use of an office building “intended and designed to be used by Hertz as a corporate headquarters,” id. at 195, was as a corporate headquarters and not as a general office building. Id. at 195-96. The court valued the property for this use by employing the cost approach. Ibid. Our Supreme Court’s denial of certification from the Appellate Division’s affirmance of the Tax Court’s decision suggests recognition by the *132 Court that the Tax Court’s analysis was consistent with Ford Motor Co.
In MCI Telecommunications Corp. v. West Orange Tp., 18 N.J.Tax 26 (Tax 1998), aff'd o.b., 19 N.J.Tax 114 (App.Div.2000), the four-story building at issue was constructed as a telecommunications facility based on the plaintiffs specific requirements, had few windows on the first floor and none on the second and third floors, and no central heating or air conditioning systems serving any of the first three floors where the fourth floor had these services and windows and was used as office space. The Tax Court rejected the taxpayer’s contention that, because current technology no longer required the use of the building’s special features for a telecommunications facility, the highest and best use of the building was as a data center (three floors) and office (fourth floor). The court concluded: “Taxpayer did not prove by a preponderance of the evidence that the property’s use changed. Rather, taxpayer continues to use the property as originally intended, as a telecommunication transmission facility.” Id. at 31. The court held that the property was special purpose under the definition in Ford Motor Co., and used the cost approach to value the property.
The preceding discussion demonstrates that the highest and best use of the subject property can and should be determined on the basis of a hypothetical market for the property as an automobile assembly facility. This hypothetical market would attribute value to the features of the subject plant (reinforced structural steel, large electrical capacity, and taxable equipment) specific to an automobile assembly use, and having little or no value for any other use. Plaintiff installed those features without any concern as to recovery of the costs incurred, has made full use of the features during the years under appeal, and at no time during those years has there been any indication that plaintiff intended to discontinue its automobile assembly operations at the subject property and offer the property for sale.
Determining a highest and best use that will result in value being attributed to the automobile assembly features of the sub- *133 jeet property is consistent with and effectuates the public policy of fairly and equitably distributing the property tax burden. Therefore, based on the preceding analysis, I conclude that, for all years under appeal, the highest and best use of the subject property was for use as an automobile assembly plant.
C. The Hypothetical Market — Decisions in Other States
My highest and best use determination in Subsection B is consistent with, and supported by, not only the foregoing New Jersey decisional law but also court decisions in other states involving the valuation for property tax purposes of limited market properties.
Under facts similar to those before me, the Supreme Court of Oregon made a similar highest and best use determination. In STC Submarine, Inc. v. Department of Revenue, 320 Or. 589, 890 P.2d 1370 (1995), the property in issue was designed specifically as a marine fiber optic cable manufacturing plant. The taxpayer argued that, on the applicable assessment date, the worldwide market for fiber optic cable was declining and, as a result, there was no market for a plant manufacturing the product. Because the taxpayer’s three existing competitors had recently acquired or built their own plants, they therefore were not in the market to acquire the taxpayer’s property. The taxpayer contended that, as a result, the highest and best use of the property was for general purpose industrial use. The Oregon Tax Court rejected this argument, STC Submarine, Inc. v. Department of Revenue, supra, 13 Or.Tax 14, and, the Oregon Supreme Court affirmed.
The nonexistence of an immediate market for a marine fiber optic cable manufacturing plant on the assessment date does not necessarily mean that taxpayer’s existing use of the building and structures is not the highest and best use.... We find that, as of the assessment date, there was a strong active market for marine fiber optic cable and that continuation of the property’s existing use remained viable.
Taxpayer's reliance on the fact that existing undersea fiber optic cable manufacturers already had their own plants ignores the possibility of new entrants into the marine fiber optic cable manufacturing business or the possibility that an existing company might have needed additional capacity and purchased taxpayer’s entire operation, including its buildings and structures, to meet that need. .
... The [Department of Revenue’s] evidence that, as of the assessment date, a market demand continued to exist for taxpayer’s products and services supports *134 the department’s conclusion that taxpayer’s existing use of its building and structures was their “highest and best use.” We find that the highest and best use of the subject property on the assessment date was its existing use as a marine fiber optic cable manufacturing plant.
[STC Submarine, Inc. v. Department of Revenue, supra, 890 P.2d at 1372-73.]
In Freedom Federal Savings and Loan Association v. Department of Revenue, 310 Or. 723, 801 P.2d 809 (1990), the Oregon Supreme Court refused to value a financial institution’s headquarters building as a multi-tenant office building.
Although the savings and loan industry may have been weak, on the assessment dates taxpayer fully occupied the property as its headquarters. Whether the highest and best use would continue to be a financial institution’s headquarters after the assessment dates is irrelevant.
[Id. at 811.]
In Fred Meyer, Inc. v. Department of Revenue, 12 Or. Tax 85, 1991 WL 244494 (Or. T.C.1991), the Oregon Tax Court held that conversion of a warehouse property to office use did not establish highest and best use as an office where the taxpayer’s office use was a more intense use than the warehouse use that the market would consider appropriate for the building. This decision is cited and discussed by the New Jersey Supreme Court in Ford Motor Co., but the Court does not discuss the Oregon Supreme Court’s holdings in Freedom Federal Savings and Loan Association, which had been decided at the time of the Ford Motor Co. decision, and STC Submarine, which was not decided at that time.
The New York Court of Appeals, in determining the property tax value of the Seagram office building in New York City, recognized that, for tax assessment purposes, a building bearing the name of the owner may include a value which neither rental income nor a sale price would reflect. Therefore, the tax assessment value of the property, while the owner remained in occupancy, could be deemed enhanced by attributing an above-market rental to the space occupied by the owner as a result of the benefits of having its name attached to the building. Joseph E. Seagram & Sons, Inc. v. Tax Comm’n of New York, 14 N.Y.2d 314, 251 N.Y.S.2d 460, 200 N.E.2d 447 (1964).[7] The Court of *135 Appeals made a similar analysis in Allied Corp. v. Town of Camillus, 80 N.Y.2d 851, 590 N.Y.S.2d 417, 604 N.E.2d 1348 (1992). There the issue was the property tax value of 1000 acres of earthenwall waste beds and buffer zones which were used for the deposit of industrial waste. The taxpayer contended that, during the years under appeal, the property was no longer receiving waste, had no further industrial use, and, therefore, should be valued as a property having no immediate practical use. The court concluded that the property should have been valued as a special purpose facility, namely, as a waste bed for the receipt of industrial waste. Id. at 417, 604 N.E.2d at 1353.
Decisions of the New York Appellate Division reflect the same approach. In New York Stock Exchange Building, Co. v. Cantor, 221 A.D. 193, 223 N.Y.S. 64 (1927), aff'd, 248 N.Y. 533, 162 N.E. 514 (1928), the court determined that the New York Stock Exchange Building should be valued for its use as such and rejected the argument that the building had no value because only the Stock Exchange could use it and therefore it could not be sold. In General Motors Corp. Central Foundry Division v. Assessor of Massena, 146 A.D.2d 851, 536 N.Y.S.2d 256 (1989), the Appellate Division considered the tax assessment valuation of a General Motors aluminum casting plant.
It appears that petitioner’s expert chose the comparables [ (involving facilities used for warehousing and light industry or light manufacturing) ] on the theory that prospective purchasers of the subject property might use the property for a purpose which would not require any of its heavy industrial features, such as the 30-ton craneway, reinforced flooring, large electrical supply and waste treatment facility. Since value is to be determined on the basis of the condition of the subject property according to its state on the taxable status date, not on the basis of some use contemplated in the future, we find no error in Supreme Court’s conclusion that the market data analysis of petitioner’s expert was seriously flawed by the failure to take into account the heavy industrial capacity of the subject property in the selection and analysis of comparable sales.
[Id. at 257-58 (citations omitted).]
Where the New York courts have found that a facility devoted to a particular use could readily and inexpensively be converted to alternate uses, the courts have permitted the property to be valued in accordance with such potential alternate uses. For example, in a tax appeal involving a building in excess of *136 1,500,000 square feet used by The Great Atlantic and Pacific Tea Company for food processing, warehousing, and shipping, containing seventy-three loading docks, laboratories, several interior railroad sidings and cold storage facilities, the New York Court of Appeals found that the facility could be converted to general industrial use “without a substantial expenditure of funds,” Great Atlantic & Pacific Tea Company, Inc. v. Kiernan, 42 N.Y.2d 236, 397 N.Y.S.2d 718, 366 N.E.2d 808, 812 (1977), and therefore, should be valued based on comparable sales and not based on a cost approach. As discussed below, plaintiff General Motors Corp. has failed to prove that the subject property could be converted to an alternative use without substantial cost.
In Pennsylvania, one decision of that state’s Supreme Court indicates that Pennsylvania will disregard the existing use of property and will require that it be valued at a highest and best use which represents the most likely use to which the property actually would be put if sold. F & M Schaeffer Brewing Co. v. Lehigh County Board of Appeals, 530 Pa. 451, 610 A.2d 1 (1992). However, succeeding decisions indicate that Schaeffer Brewing does not set forth controlling law, and that Pennsylvania’s approach to highest and best use analysis is similar to New York’s approach.
In In re V.V.P. Partnership, 167 Pa.Cmwlth. 282, 647 A.2d 990 (1994), appeal denied, 540 Pa. 615, 656 A.2d 120 (1995), the Pennsylvania Commonwealth Court valued a tennis, racquetball, and squash facility using actual income. In rejecting the argument based on Schaeffer Brewing that this approach resulted in a value in use, the court commented as follows: ‘We also note that in F & M Schaeffer four Justices concurred in the result only; hence Justice Larsen’s rationale has no precedential value and is non-binding on this Court.” Id. at 287 n. 4, 647 A.2d 990. In Air Products & Chemicals, Inc. v. Board of Assessment Appeals of Lehigh County, 720 A.2d 790 (Pa.Commw.Ct.1998), the property under appeal was Air Products’ corporate headquarters consisting of 500 acres of land with six administration buildings, four research and development facilities, plus storage and support facilities, a maintenance building, field house, and fitness center. The *137 taxpayer valued the property in the condition in which it was held, that is, one single tract containing all of the buildings relating to the taxpayer’s operation. The appraiser for Lehigh County valued the property as if it had been subdivided into two independent parcels, each having a separate highest and best use, on the basis that the property was more marketable and more likely to be acquired if subdivided into smaller parcels and marketed in two parcels. The Court rejected the County’s position.
Properly understood, the Schaeffer Brewing holding which prohibits value-in-use assessments for tax purposes does not, as the County suggests, abrogate the principle discussed below, that fair market value is to be determined based upon the current condition of the property.
The County’s theory of valuation appears to be based upon a misunderstanding of the concepts of both highest and best use and value-in-use.... The appellate courts of this Commonwealth have held that reasonably foreseeable prospects for a property which exist at the time of an assessment may be considered in determining a property’s fair market value, e.g. — its probable use, lease or sale. However, consideration of factors based upon pure speculation, such as what the property would be worth in an altered condition are irrelevant to the issue of fair market value.
In other words, hypothetical ways in which the property could be used by potential buyers should be considered in determining what a willing buyer would pay for the property. That is not to say, however, that the property should be valued as though it were already in that hypothetical condition.
[Id. at 793-94 (citations omitted).]
Two decisions of the Minnesota Supreme Court illustrate that state’s approach to taxation of facilities dedicated to a particular use and not easily converted to another use. In Federal Reserve Bank of Minneapolis v. State, 313 N.W.2d 619 (Minn.1981), the Court considered the valuation, for property tax purposes, of the Federal Reserve Bank building in Minneapolis. The Court noted that the property contained “a special purpose building, specifically designed to meet the needs of the bank,” with 60% of the building “built differently than if it had been designed as an office building.” Id. at 622. The Court distinguished the building before it from the improvements at issue in Space Center, Inc. v. County of Hennepin, 302 N.W.2d 17 (Minn.1981).
Space Center is not in point. There we held it was error for the Tax Court to value a building erected as a commercial warehouse structure not as the warehouse to which it would revert on the market, but by its then current short term, near-obsolete value-in-use as a modified defense-contract facility____ Whereas the special purpose exception is applied to a building in good condition being used *138 currently and for the foreseeable future for the unique purpose for which it was built, the Space Center doctrine, by contrast, is applied ... to a general purpose building, the design of which is inappropriate or incongruous for its current use. The former approach, more relevant here, is designed to prevent the owner of a distinctive but highly useful building from escaping full property tax liability, while the latter approach is designed to reduce the harshness of applying “intrinsic use” values to an obsolete building.
[Federal Reserve Bank of Minneapolis v. State, supra, 313 N.W.2d at 623.]
In an earlier decision, McCannel v. County of Hennepin, 301 N.W.2d 910 (Minn.1980), the Minnesota Supreme Court followed the same approach in considering the value for tax assessment purposes of property at the Minneapolis-St. Paul International Airport consisting of Northwest Airlines’ main base facilities and its cargo handling facility. The Court held as follows:
“Market value,” the basis for all assessment valuation, is an attempt to create a fictitious sale of the subject property by assuming an owner willing to sell and a buyer desiring to buy____Although much of Northwest’s expert testimony at trial was intended to demonstrate that there were no actual buyers for Northwest’s property for use as an airplane facility, and therefore it should not be valued as such, the trial court correctly discounted this testimony.
Northwest argues that the trial court’s method of valuing its property as unique property violates the general rule that property should be valued at its market value rather than its intrinsic value. Although the concepts of intrinsic value and unique property are closely parallel in cases such as this, the trial court did value the property by determining its reproduction cost, an accepted method of estimate ing market value. To state it differently, the trial court determined the value of the property according to its highest and best use as an airport facility without regard to who might own it. The fact that its intrinsic value to Northwest Airlines might be equal to its value to a hypothetical buyer as an airport facility does not render the trial court’s method of valuation invalid.
[Id. at 924-25 (citation omitted).]
Three decisions of the Supreme Court of Iowa are in accord with the foregoing reasoning. In Maytag Co. v. Partridge, 210 N.W.2d 584 (Iowa 1973), the Court held that manufacturing machinery, which by statute was considered real property for assessment purposes, should be valued not at its price on the used machinery market but at its cost less depreciation.
Considering conditions existing at the time of valuation and the condition of the property in which Maytag holds it, we have here a complete line of machinery, in place and functioning, an integral part of a profitable manufacturing establishment, coordinated into an operating whole by an engineering staff.
*139 We thus reject the assumption that the value of machinery in use equals the used machinery market price.
[Id. at 589-90.]
The Court concluded that “[presumably another competent home appliance manufacturer could step into Maytag’s shoes and operate this plant.” Id. at 591. Using a similar analysis, Ruan Center Corp. v. Board of Review of the City of Des Moines, 297 N.W.2d 538 (Iowa 1980), holds that improvements to office space made by tenants, at their expense, including an earthquake-proof floor, wall paneling, and a bank vault, should be included in the assessment on the building.
Presumably, if the tenants sold their leasehold interest, they could charge for the improvements. Upon expiration of the leases, Ruan could charge higher rent because of the improvements than it could if the property remained at building standard construction. Although some improvements, such as the vault added by the bank or the area for a computer that Blue-Cross installed, are not of value to every potential tenant, there is no evidence that another bank or company with computers could not use the space.
[Id. at 541-42.]
In Merle Hay Mall v. City of Des Moines Board of Review, 564 N.W.2d 419 (Iowa 1997), the Iowa Supreme Court held that improvements made for tenants in a shopping mall could be included in the assessment on the mall and that such inclusion would not constitute the adoption of a use value to its owner. A witness for the shopping mall testified that a buyer of the mall would not pay any added amount for the improvements because they would be of no use to a future tenant. Relying on its holdings in Ruan and Maytag, the Court concluded that the improvements were assessable because they “might well have value both to the present mall owner and to future tenants.” Id. at 425-26.
Although the foregoing decisions represent the predominant approach in other jurisdictions to valuation of limited-market properties, two seemingly contrary results have been located. In First Federal Savings & Loan Assoc. of Flint v. City of Flint, 415 Mich. 702, 329 N.W.2d 755 (1982), the Michigan Supreme Court held that: “The law does not tax expenditures that merely enhance the image or business of the owner, only expenditures that add to the cash value or selling price of the property.” Id. at 757. *140 This decision is contrary not only to the New York Court of Appeals holding in Joseph E. Seagram & Sons, Inc., supra, 14 N.Y.2d 314, 251 N.Y.S.2d 460, 200 N.E.2d 447, but also to our Appellate Division’s ruling in CPC International, Inc. v. Englewood Cliffs Bor., supra, 193 N.J.Super. 261, 473 A.2d 548. In Chrysler Corp. v. State Property Tax Appeal Bd., 69 Ill.App.3d 207, 25 Ill.Dec. 695, 387 N.E.2d 351 (1979), the Illinois court found a value for an automobile assembly plant based on what the sales price for the property tax would be for a different use. The decision contains no discussion of highest and best use and the rationale for the court’s conclusion is unclear.
The Wisconsin Supreme Court’s opinion in State v. Weiher, 177 Wis. 445, 188 N. W. 598 (1922), probably is contrary to the predominant approach, but is somewhat enigmatic. The Court held that “a fine substantial, artistic building gracing half a block in the City of Milwaukee built to meet the peculiar needs of its owner, and not well adopted for other uses,” could be valued “taking into consideration the actual situation as it existed in Milwaukee at the time.” Id. at 599. The “actual situation” to which the Court refers appears to be the lack of a market of potential purchasers with needs similar to the owner’s and not the suitability of the building for the owner’s needs. Research did not disclose any more recent decision of the Wisconsin courts that definitively clarified this holding. See State ex rel. Markarian v. City of Cudahy, 45 Wis.2d 683, 173 N.W.2d 627 (1970) (citing Weiher for the proposition that market value for tax assessment purposes is not based on the intrinsic value of a property “if the intrinsic value differs either more or less from the sale value.” Id. at 629.).
D. The Actual Market
Even if a hypothetical market is an inappropriate basis for determining the highest and best use of the subject property, my conclusion as to the property’s highest and best use remains the same based on the actual market. Although sale of the property for continued automobile assembly use was unlikely as of each assessing date, a sale for that use would produce the highest value for the property, as explained above, and a limited, but actual, *141 market existed for the use. The reality and nature of this market are indicated by the following facts.
(1) Automobile assembly plants were constructed, renovated and refitted throughout the country during the years under appeal.
(2) Plaintiff and other automobile manufacturers continued to operate plants along the East Coast. In 1982, plaintiff operated five automobile assembly plants along the east coast, and in 2003 continued to operate three of them. In 1983, Ford Motor Company was operating plants in New Jersey, Georgia and Virginia. Those plants remained in operation through the years under appeal (the New Jersey plant recently has been closed). In 1983 Chrysler, operated one plant in Delaware, and, in 2003 continued to operate that plant and opened a new plant in Georgia. BMW had no East Coast plants in 1983, but by 2003 had opened a plant in South Carolina.
(3) There was a concentration of population and, thus, potential automobile purchasers near the subject plant, with 17% of the population of the United States, approximately 48,000,000 people, located within a two hundred mile radius and 3% of the population, approximately 8,000,000 people, located within a twenty mile radius.
Defendant’s site location expert testified that a plant location in the Northeast creates a greater risk for an automobile manufacturer than a plant in the automobile corridor in the Midwest because, if automobile purchasers in the Northeast reject a model, the costs of selling elsewhere in the United States a model manufactured in the Northeast will be much higher than the costs relating to a Midwest location. I place little reliance on this testimony for the following reasons: (a) the witness provided no analysis or quantification of the alleged cost differential or “severe [cost] penalty” as he described it; (b) plaintiff has continued to produce automobiles at the subject plant even though, as acknowledged by plaintiffs director of manufacturing planning, demand in the Northeast for the models produced at the plant has not been as strong as the demand for the same models elsewhere in the United States; (c) the testimony fails to consider the outbound freight cost savings on models sold in the Northeast to the population concentrated in the region; and (d) the testimony fails to consider that inbound freight charges in connection with the shipment of parts and supplies to the subject plant from suppliers in the Midwest might be lower than the freight charges for shipments to other plants operated by plaintiff, such as its plant in Shreveport, Louisiana.
(4) As discussed above in Item 11 of Section IV, several sales of individual assembly plants for continued use as such look place.
(5) Assembly plants were sold for continued use as part of business acquisitions or mergers. See Westinghouse Electric Corp. v. Bloomfield Tp., supra, 9 N.J. Tax at 99 (using a going concern sale of a lamp manufacturing plant as corroborating the court’s highest and best use finding). Plaintiffs theory witness acknowledged in his testimony that these types of transactions can evidence market demand for a type of property. See also, William N. Kinnard, Jr., et al., Industrial Real Estate 498 (4th ed. 1984) (“Consider the large, customized, functional industrial manufacturing enterprise which is operated by a single-plant manufacturer. If the operation is a viable one with a history of profitability and a forecast of continued profitability, the whole enterprise can sell on the *142 open market.”). That real estate value may be difficult to extract from these sales, see The Appraisal of Real Estate, supra, at 27 (“It may be difficult to separate the market value of the land and the building from the total value of the business____”) does not diminish the utility of going concern sales as indicators of highest and best use.
(6) Plaintiff made significant expenditures for the renovation, expansion, retooling, and refitting of the subject plant for different automobile models during the years under appeal. As set forth above, plaintiff expended almost $590,000,000 between 1977 and 2000, almost $550,000,000 during the years under appeal, and almost $250,000,000 during the years 1990 to 2003, when plaintiff contends that the highest and best use of the facility did not include automobile assembly. In making its decision to renovate, expand, retool, and refit the property, plaintiff selected and, in effect, “purchased” the property from alternatives available to it, thus confirming the value and utility of the property for automobile assembly use. The selection process involved comparative analyses of potentially available plants with respect to the following factors: labor relations; the quality of the labor force; the configurations of the plants and their respective abilities to build different vehicle architectures; location, particularly as to inbound freight costs; the plants’ respective production capacities; the size and condition of the plants, particularly the condition of the paint shop; and local and state government relations.
During the years under appeal, plaintiff closed fifteen automobile assembly plants, but opened seven new plants, all in the United States, partnered with A.M. General for a new plant in 2002, and entered into a joint venture with Toyota for the NUMMI facility in California, which included a major expansion of the plant. Therefore, if the subject plant was inefficient or obsolete, plaintiff had the ability, financial and otherwise, to close it and replace it.
When plaintiff elected to refit and retool the subject plant in 1985, it had, as alternatives, the use of the plants in Michigan, Massachusetts, Ohio, and Kansas, which were closed in or about 1985. When plaintiff elected to expand, retool, and refit the subject plant in or about 1990 and selected the plant as the lead facility for assembly of the ST Truck, it also considered three other plants for that role and had, as additional alternatives, the use of plants in California, Georgia, Ohio, Kansas, Massachusetts, and Ontario, each of which closed in that year or at the time conversion of the subject plant to ST Truck production was under consideration.
Plaintiffs director of manufacturing planning, who was the resident comptroller at the subject plant from 1988 to 1990, testified that timing was an important factor in the selection of the subject plant to produce the E-K Car model, the L Car model, and the ST Truck, and that the plant “got lucky” as to each vehicle model. Given the extensive analyses that plaintiff required as a prerequisite to plant selection, I conclude that timing surely was an important factor in the selection process, but that the subject plant would not have been selected if it did not receive satisfactory ratings on most, if not all, of the factors set forth above.
This witness also testified that, as of the time of conversion of the plant to ST Truck production, and as of 2001 and 2002, the plant was not obsolete. He described the plant as suitable for the vehicle production assigned to it although modifications to some of the processing equipment were required. This testimony is consistent with evidence presented that (a) the size of the subject land was *143 adequate for an automobile assembly plant, (b) additional adjacent land from time to time was available for purchase to alleviate any size inadequacy, and plaintiff elected not to make any purchases except for the 1985 acquisition of the Gordon’s Distillery site, and (c) the paint booths and ovens, and related make-up air units at the subject plant complied with environmental laws applicable to a solvent-based paint system and could be converted for use as part of a waterborne system having even less environmental impact.
In connection with the preceding discussion, I note the testimony of plaintiffs marketing and manufacturing strategies expert that, beginning in or shortly after 1979, a structural shift occurred in the automobile industry, and domestic automobile manufacturers concluded that, in order to meet competition from foreign manufacturers, they would have to close non-competitive, previously satisfactory plants and make permanent changes in the way they did business. Notwithstanding this structural shift and the resulting need for radical changes in the domestic industry, plaintiff continued to renovate, expand, retool, refit, and operate the subject property. In connection with the refitting and retooling that took place in 1985, the plant manager was quoted in a newspaper article as describing the subject property as “the most highly automated plant in North America.” Another newspaper article reported that, at a news conference at the subject plant in July 1985, officials of plaintiff stated that the plant would include “the most modern body shop in North America” and that the plant would use “the so-called ‘just-in-time’ inventory system.” This suggests that, in 1985, the demand for the products manufactured at the property remained strong, and the subject plant remained viable, competitive, and adaptable to new production methods and therefore suitable for use by another automobile manufacturer.
Plaintiffs continued use of the plant since 1985 confirms the existence of continuing demand for the vehicles produced at the plant, and the plant’s continuing flexibility and viability. See Industrial Real Estate, supra, at 83 (“The demand for industrial real estate is a derived demand ... [Tlhe product or result of the industrial process — fabrication, assembly, storage or distribution — is the primary object of demand. Industrial real estate is needed because these activities must be housed.”).
(7) Plaintiff had committed to a cogeneration facility pursuant to an Energy Sales Agreement dated June 28, 1996. Under this Agreement, plaintiff sold two and one-half acres of its property to Quixx Linden, L.P., for construction of a cogeneration facility. The Agreement granted to plaintiff the following: (i) the right to approve the design and capacity of the facility, which was to deliver to plaintiff its requirements for electricity and steam at the subject property for a term of fifteen years; (ii) options to extend the term of the Agreement for three additional periods of five years each; (iii) an option to purchase the facility for fair market value; and (iv) the right to terminate the Agreement at any time upon one-hundred eighty days notice, subject to reimbursement to Quixx of all outstanding indebtedness with respect to the facility, plus the amount of Quixx’s unrecovered equity and costs, and a 15% return on equity. A schedule attached to the Agreement indicated an estimated cost for the facility of approximately $34,000,000.
(8) The difference in cost between the subject facility and a new plant was, and remains, significant. It is undisputed that a new automobile assembly plant, including equipment, costs approximately $1,000,000,000 to build and equip. The *144 subject plant presumably could have been acquired for far less than that amount and, even after adding the cost of adapting the plant to the particular production methods of the purchaser, the total cost to another automobile manufacturer of acquiring the subject plant would have been significantly less than the cost of construction of a new facility elsewhere.[8]
In support of plaintiffs contention that, as of any of the assessment dates in issue, no market demand existed for the subject property as an automobile assembly facility, plaintiffs experts described the property as obsolete for that use, primarily because of land size, location, and the plant’s solvent-based paint system. However, the following factors demonstrate that the claims of obsolescence are significantly overblown, if not totally without merit: (1) plaintiffs continuous use of the property for automobile assembly purposes; (2) plaintiffs failure to acquire available adjoining land; (3) the suitability of the plant for the just-in-time inventory system; (4) the construction during the years under appeal of automobile assembly plants on a similar number of acres which were part of larger sites; (5) the continuation in operation during the years under appeal of other East Coast automobile assembly plants; (6) the population density within a two hundred mile radius and twenty mile radius of the subject property; (7) installation during the years under appeal of new solvent-based paint systems by plaintiff in other plants and by other automobile manufacturers; (8) the compliance of the existing solvent-based system at the subject plant with environmental laws and the ability of a purchaser to continue to use that system; and (9) the convertibility of the paint booths, ovens and make-up air units at the subject plant to a waterborne system.
A critical element in the acquisition of the subject facility for continued use for automobile assembly purposes would be the timing of the availability of the plant. If, at the time the plant becomes available, no automobile manufacturer is seeking an assembly facility, then, obviously, the likelihood of a purchase for *145 automobile assembly use is non-existent. If, however, at the time the subject plant becomes available, another automobile manufacturer is seeking an assembly facility, then there is at least a possibility that the subject plant would satisfy that manufacturer’s needs and would be acquired for automobile assembly use. Any other conclusion would, in the words of the Oregon Supreme Court, “ignore[ ] the possibility of new entrants into [the automobile assembly] business or the possibility that an existing company might have needed additional capacity and purchased [plaintiffs] entire operation, including its building and structures, to meet that need.” STC Submarine, Inc. v. Department of Revenue, supra, 890 P.2d at 1372.
VIII.
Use Value Versus Value In Use
The preceding discussion, especially in subsections B and C of Section VII, demonstrates that, for property tax assessment purposes, the New Jersey courts and courts of other states have valued viable, operating, limited-market properties, such as the subject property, at highest and best uses which are the same as their respective existing uses, that is, in the condition in which the properties were held as of the applicable valuation dates. In so doing, the courts have recognized and described this approach as resulting in a fair and equitable allocation of the tax burden to a taxpayer using a facility designed for it, having features installed by it, and having particular value for the use to which the property is being put.
Such a highest and best use determination is not based on value in use because the determination is a function of property use and not a function of a particular owner’s use or subjective judgment as to how a property should be used. See Entenmann’s Inc. v. Totowa Bor., 18 N.J.Tax 540, 545, 547-48 (Tax 2000) (discussing the statement in The Appraisal of Real Estate that highest and best use “is not determined through subjective analysis by the property owner ...” The Appraisal of Real Estate, supra, at 305.). Thus, the highest and best use determination is *146 based on use value not value in use. Use value is defined as follows: “In real estate appraisal, [use value is] the value a specific property has for a specific use; [it] may be the highest and best use of the property or some other use specified as a condition of the appraisal; ...” The Dictionary of Real Estate Appraisal, supra, at 303. Value in use is defined as “[t]he value a specific property has to a specific person or a specific firm as opposed to the value to persons or the market in general.” Id. at 306.
In support of its argument that automobile assembly use is a value in use and therefore, cannot be the highest and best use of the subject property, plaintiff cites a hypothetical posed to defendant’s appraiser during the trial of the 1983, 1984 and 1985 appeals. The hypothetical assumed two adjacent, physically identical, fully-equipped automobile assembly facilities in Linden, both “ready to go,” with one owned by plaintiff and the other owned by plaintiffs counsel. As plaintiff describes the appraiser’s testimony, when asked whether the buildings would have the same value, he responded in the negative on the basis that the market would support only one assembly plant in Linden — plaintiffs plant. Plaintiff argues that the appraiser’s testimony demonstrates that his highest and best use conclusion is based on plaintiffs use of the property, and thus demonstrates the error of the appraiser’s analysis and any analysis resulting in a conclusion that the highest and best use of the subject property is as an automobile assembly plant. Plaintiff asserts that two adjacent identical facilities must have the same value regardless of the uses of the facilities by their respective owners, relying on Fort Lee Bor. v. Hudson Terrace Apartments, 175 N.J.Super. 221, 417 A.2d 1124 (App.Div.1980)
I reject plaintiffs argument because plaintiffs description of the appraiser’s responses focuses on only a portion of his testimony with resultant distortion, and because plaintiff has misinterpreted the holding of Hudson Terrace Apartments.
The transcript of the 1983-85 trial reveals that defendant’s appraiser resisted responding to the hypothetical because it did not contain “enough information.” The appraiser stated that “with the information you gave me, I don’t think I could answer.” *147 Then, after “presum[ing] that there is demand for only one [automobile] manufacturer and only for the produced [sic] from one of those properties,” the appraiser gave the testimony cited by plaintiff, namely, that the two properties would have different values. When asked whether the difference in value was attributable to the absence of a General Motors-type distribution network at the hypothetical plant owned by plaintiffs counsel, defendant’s appraiser testified that one factor alone was insufficient to explain the difference.
The testimony of defendant’s appraiser properly reflects the complexity of a highest and best use analysis of a massive automobile assembly plant and valuation based on that analysis. As discussed above in Sections III and Vil A, in order to determine highest and best use, an appraiser must consider whether a use is physically possible, legally permissible, financially feasible, and maximally productive. For certain properties, such as an assembly plant, special factors and concerns may be applicable, particularly in the tax appeal context. Simply hypothesizing two adjacent, physically identical buildings provides a wholly inadequate basis for a highest and best use determination. Plaintiffs hypothetical, therefore, was over-simplified, and the responses by defendant’s appraiser do not support plaintiffs contentions.
Plaintiffs argument based on the responses of defendant’s appraiser to the hypothetical also receives no support from the decision in Fort Lee Bor. v. Hudson Tenuce Apartments, supra, 175 N.J.Super. 221, 417 A.2d 1124. In that case, the Appellate Division held, in the context of a tax appeal, that the municipality was not entitled to discovery of the taxpayer’s income tax returns because property value must be determined without regard to the tax benefits a particular owner might realize from the property.
Were this not so, adjacent parcels of land improved with identical structures might be valued differently to the extent that their respective owners’ personal situations differed, even though in the open market each parcel would sell for the same price at a fair and bona fide sale by private contract — i.e., a transaction between a buyer willing but not obliged to buy and a seller willing but not obliged to sell.
[Id. at 226, 417 A.2d 1124 (emphasis supplied).]
*148 Plaintiff relies specifically on the preceding quotation. This reliance is misplaced. The quotation appears in the portion of the court’s opinion discussing the irrelevance to property tax valuation of a property owner’s individual financial circumstances. Neither this portion nor any other portion of the opinion discusses the impact of different highest and best uses on the respective values of two identical properties. Indeed, the quotation assumes that, in the marketplace, the two “identical” properties would sell for the same price, thereby impliedly assuming identical highest and best uses.
Here, defendant’s appraiser did not respond to plaintiffs hypothetical in terms of the identity of the owner of each of the hypothetical automobile assembly plants or in terms of the particular financial circumstances of plaintiff or plaintiffs counsel. The basis for his response was limited to the respective highest and best uses of the hypothetical plants. He testified appropriately that, if the market would support only one automobile assembly facility and, therefore, the highest and best use of one plant was for that use and the highest and best use of the other was for another use, the two plants would sell for different prices.
The Appraisal of Real Estate recognizes the concept that two identical properties could have different highest and best uses. “[A] property’s highest and best use may be unusual or even unique. For example, market demand may be adequate to support one large, multistory office building in a community, but it may not support more than one.” Id. at 321. The Tax Court applied this principle in Chevron U.S.A., Inc. v. City of Perth Amboy, 10 N.J.Tax 114 (Tax 1988), aff'd, 11 N.J.Tax 480 (App.Div.1989), certif. denied, 121 N.J. 628, 583 A.2d 324 (1990), where the court held that two storage tanks could have values dramatically lower than a third, physically identical, tank if only the third tank had utility and the other two constituted “superadequacies or superfluities.” Id. at 150. The Linden market will support only one automobile assembly plant. During the years under appeal, and during preceding and subsequent years, plaintiff has used the subject property continuously as an assembly plant and has invested hundreds of millions of dollars in renovations, retoolings, *149 additions, and improvements. Under applicable appraisal principles and the analysis in Chevron U.S.A, and pursuant to the policy of fairly distributing the property tax burden, these circumstances warrant a determination that the subject property has a different highest and best use, and consequently a different value, from a hypothetical adjacent, physically identical, property, “ready to go” but never actually used or operated as an automobile assembly plant.
IX.
Plaintiffs Failure of Proof as to Alternate Uses
If I had concluded that neither a hypothetical market analysis nor an actual market analysis would support a conclusion that the highest and best use of the subject property was as an automobile assembly plant, my highest and best use determination would not change. Plaintiff bears the burden of proving that a use other than the existing use of the subject property on each of the assessment dates in issue constituted its highest and best use.
[I]f plaintiff seeks to demonstrate that a property’s highest and best use is other than its current use, it is incumbent upon plaintiff, and not defendant, to establish that proposition (alternate use) by a fair preponderance of the evidence.
[Ford Motor Co. v. Edison Tp., supra, 10 N.J.Tax at 167.]
See also, MCI Telecommunications Corp. v. West Orange Tp., supra, 18 N.J.Tax at 31; Highview Estates v. Englewood Cliffs Bor., 6 N.J.Tax 194, 200 (Tax 1983) (“Property should be assessed in the condition in which it is utilized and the burden is on the person claiming otherwise to establish differently.”) Plaintiff failed to satisfy its burden of proof.
Plaintiffs proofs were deficient in three respects: (1) plaintiffs appraisal expert failed to make the market and marketability studies that plaintiffs theoiy expert described as essential to a reliable highest and best use analysis; (2) plaintiff failed to identify a single highest and best use for the subject property for tax years 1990-2003 (plaintiff acknowledged that automobile assembly use was a highest and best use for tax years 1983-1989); *150 and (3) plaintiff failed to consider the costs of converting the subject property to an alternate use.
As described above, plaintiffs theory witness testified as to the current theory of highest and best use determinations, and the necessity for a market and marketability analysis in accordance with the guidelines set forth for the first time in the twelfth edition of The Appraisal of Real Estate, published in 2001, and in the Appraisal Institute’s Course 520 (first taught in or about 1994). The witness concluded that the highest and best use analyses by defendant’s appraiser and theory witness failed to comply with these guidelines and consequently were deficient and unreliable. Plaintiffs theory witness was not engaged to, and did not, review or comment on the highest and best use analysis by plaintiffs appraiser.
Cross-examination of plaintiffs theory witness established the following. The materials for Course 520 make no specific mention of large industrial facilities and do not use such facilities in any examples. The witness had no experience in appraising automobile assembly plants, had never seen the interior of an assembly plant, and had not appraised or opined as to the highest and best use of a manufacturing facility in excess of 1,000,000 square feet (the subject facility contains approximately 2,500,000 square feet). The witness examined the highest and best use reports prepared by defendant’s witnesses, but did not review the reports prepared by defendant’s appraiser in connection with the trial of the 1983-1985 appeals and in connection with the taxability of personal property phase of this trial.
Based on the preceding discussion, I have serious reservations as to: (a) the experience of plaintiffs theory witness with large manufacturing facilities and automobile assembly plants in particular, (b) the applicability to automobile assembly plants of the market and marketability analysis to which the witness testified, and (c) the necessity for a market and marketability analysis for years preceding 2001, the year in which The Appraisal of Real Estate, for the first time, discussed in detail and at length the role of this analysis in the appraisal process. However, for purposes of *151 discussion, I will assume that a market and marketability analysis would be appropriate for the subject property and that the witness’s critique of defendant’s witnesses is valid. Based on that assumption I conclude that, if he had examined the report of plaintiffs appraiser, plaintiffs theory witness necessarily would have determined that, for tax years 1990 through 2003, the appraiser’s highest and best use analysis was as deficient and unreliable as the analyses of defendant’s witnesses. This conclusion is based on the failure of plaintiffs appraiser to make the appropriate market and marketability studies as to the alternate uses he identified for the subject property.
As set forth above, plaintiffs appraiser opined that, for tax years 1983 through 1989, the highest and best use of the subject property was for “single occupant manufacturing utilization with related offices and warehousing services____ The assembly of automobiles is one category of occupancy that matches this observation but does not represent the sole use for which the subject is adaptable.” As noted above, I regard this opinion as consistent with my conclusion as to highest and best use. For tax years 1990 through 2003, the appraiser opined that the highest and best use of the property was for “single or multiple occupant manufacturing, warehousing, distribution, and/or wholesale trade.” In reaching this conclusion, the appraiser conducted a property productivity analysis in which he compared the subject property with a modem automobile assembly facility, but he made no such analysis as to any of the alternate uses. He considered applicable zoning and the general regional market within which the subject property is located. He made a demand and supply analysis as to automobile manufacturers but not as to any of the other uses which he concluded were included in the highest and best use of the subject property. He made no study of the extent to which the subject property was likely to capture any demand in the market for any of the uses included in his highest and best use analysis. The market and marketability analysis by plaintiffs appraiser, therefore, is subject to the same criticisms that plaintiffs theory witness leveled at defendant’s witnesses, and suffers *152 from the same deficiencies and unreliability that the theory witness attributed to the analyses by defendant’s witnesses.
The highest and best use analysis by plaintiffs appraiser also is flawed because, for tax years 1990 through 2003, the appraiser failed to identify a single highest and best use for the subject property. For those years, the appraiser identified at least the following eight highest and best uses: (1) single occupant manufacturing; (2) multiple occupant manufacturing; (3) single occupant warehousing; (4) multiple occupant warehousing; (5) single occupant distribution; (6) multiple occupant distribution; (7) single occupant wholesale; and (8) multiple occupant wholesale. When the appraiser’s use of the connective “and/or” is considered, the number of “highest and best” uses encompassed by the appraiser’s opinion expands geometrically to include multiple combinations of the foregoing eight uses.
The sources on which plaintiffs theory witness relied, The Appraisal of Real Estate and the materials for the Appraisal Institute’s Course 520, expressly contemplate the determination of a single highest and best use. The Appraisal of Real Estate states as follows: “The highest and best use of a property is concluded after the four criteria have been applied and various alternative uses have been eliminated. The remaining use that fulfills all four criteria is the highest and best use.” The Appraisal of Real Estate, supra at 308. The materials for Course 520 state that, in highest and best use analysis, “[pjhysieally possible legal uses that are financially feasible are then tested for maximum productivity. The sequence proceeds from the greatest number of reasonably probable uses to the single use that is the highest and best use of the subject property.” Appraisal Institute, Course Handbook for Course 520, supra, at 3-21.
The selection of a single highest and best use enables an appraiser to determine a single value for a property based on market information relevant to that use and enables a court to determine a single value for property tax assessment purposes. An opinion that there are multiple highest and best uses almost inevitably results in multiple value determinations by the apprais *153 er. The consequence is a frustration of a court’s ability to determine the proper assessment on a property.
Here, this frustration would occur under the analysis by plaintiffs appraiser because the value of the subject property will not be the same for each of the eight or more highest and best uses he described. See Union Minerals and Alloys Corp. v. Kearny, 11 N.J.Tax 280, 285 (Tax 1990) (“The cases indicate that the condition of occupancy, i.e. single tenant, multi-tenanted, owner-occupied or even vacant, can make a difference in terms of value.” Id. at 285 (citations omitted).). For example, the rent paid by a single tenant of an entire facility will be different from the aggregate rents paid by multiple tenants each occupying substantially less than the entire building. See MSGW Real Estate Fund, LLC v. Mountain Lakes Bor., 18 N.J.Tax 364, 387, 394-95 (Tax 1998) (describing the substantial difference between the rents the appraisers for both parties used when valuing the same building at a highest and best use of single tenant occupancy and the rents they used for a highest and best use of multi-tenant occupancy). Similarly, the purchase price paid by a single purchaser of an entire facility will be different from the aggregate purchase prices paid by multiple purchasers of condominium units in the building, and the purchase price paid by a single purchaser intending to use an entire facility will be different from the price paid by an investor intending to lease the facility to multiple tenants. The rent or purchase price paid for a warehouse use may be different from the rent or purchase price paid for a manufacturing use, and each of those may be different from the rent or purchase price paid for a wholesale use. The rent or purchase price paid for upper story space may be different from the rent or purchase price paid for first floor space. Each of these various rents and purchase prices is likely to produce a different value for the subject property.
A third flaw in the highest and best use analysis by plaintiffs appraiser is the absence of any consideration of the costs of converting the subject property to any of the multiple alternate uses he identified. These costs would include, at a minimum, removal of all or most of the taxable automobile assembly equip *154 ment, and could involve installation of additional loading doors, entrances, stairwells, elevators, or showroom windows (for a wholesale use). For any of the multiple-occupant uses, minimum costs also would include separation of utility services and installation of demising walls. See Thomas J. Lipton, Inc. v. Raritan Tp., 10 N.J.Tax 202, 209 (Tax 1988), aff'd, 11 N.J.Tax 100 (App. Div.1989) (“[s]ales of large vacant industrial properties for conversion to multi-tenant industrial or office use involve substantial conversion costs”). The proofs established that the cost of converting the subject property to an alternate use would be substantial and could be in the range of $25,000,000 just for removal of the taxable equipment. Whatever the actual cost, it will lessen the value of the subject property for an alternate use.
The costs (including a provision for profit) of ... converting the existing improvements into an alternative use must be analyzed in light of the value created in the market; the effect of the changes on value is more important than simply how much the costs will be. If the changes will not be profitable, the expenditures would not be made — a point that the appraiser would be wise to incorporate into the highest and best use analysis.
[The Appraisal of Real Estate, supra, at 318.]
See Ford Motor Co. v. Edison Tp., supra, 10 N.J.Tax at 198 (stating that, after a value for the Ford Motor Co. automobile assembly plant was determined under an income approach, “one would have to deduct the actual cost of altering the facility,” to make the space suitable for a potential tenant with entrepreneurial profit added to the cost). •
Plaintiffs appraiser acknowledged that significant costs would be incurred in converting the subject plant to an alternate use, and plaintiffs theory witness acknowledged that the costs must be considered as part of a highest and best use determination, specifically in analyzing the financial feasibility of alternate uses. Plaintiffs appraiser made no study of the conversion costs, and consequently failed to discuss estimated costs or give any consideration to their impact on the value of the subject property for any of the alternate uses he described. See Six Cherry Hill, Inc. v. Cherry Hill Tp., 7 N.J.Tax 120 (Tax 1984), aff'd, 8 N.J.Tax 334 (App.Div.1986) (finding the plaintiffs’ evidence as to an alternate highest and best use to be inadequate because it “only deals with *155 reasons for rejecting current use,” id. at 130, and criticizing the plaintiffs for failing to present “any evidence to the court of the value of the buildings if substantially rehabilitated with the cost of rehabilitation to be deducted from such value in arriving at the fair market value of the properties on each of the two assessing dates.” Id. at 133.).
As a result of the foregoing deficiencies and flaws in its proofs, plaintiff has failed to establish by a preponderance of the evidence that, for tax years 1990 through 2003, a use other than as an automobile assembly plant was the highest and best use for the subject property. As set forth above, for tax years 1983 through 1989, plaintiff has acknowledged that use as an automobile assembly plant constituted a highest and best use for the property.
X.
Conclusion
For the reasons set forth above, I conclude that the highest and best use of the subject property for each of the years 1983 through 2003 was as an automobile assembly plant. Based on this conclusion, and my determinations as to the taxability of personal property, General Motors Corp. v. City of Linden, supra, 20 N.J.Tax 242, the pending appeals will now proceed to trial on the issue of value.
By letter dated December 9, 2004, plaintiff has requested that, pursuant to N.J.R.E. 201(b), I take judicial notice of its November 30, 2004 announcement that production at the subject plant will cease in February 2005. This announcement was discussed in a December 6, 2004, New York Times article, Ronald Smothers, As a Death Foretold, a Plant’s Closing Causes Little Pain, N.Y. Times, Dec. 6, 2004, at B5, enclosed with the letter. This article refers to an announcement by plaintiff that the plant “will close” in February 2005, and reports that plant workers “have suspected the layoffs could happen since 1992.”
Defendant opposes the request on the grounds that the record in this matter is closed and the “alleged facts are neither generally *156 known, nor of common notoriety.” Defendant has submitted a December 1, 2004 article from The Star Ledger, Joe Ryan, GM hastens Linden layoffs, Star Ledger, Dee. 1, 2004, at 41, and asserts that the article contains “conflicting information about the status of the plant.” This article includes the following statement: “[Dan] Flores [ (a spokesman for defendant) ] said the plant was not closing, but added the auto maker has no plans to resume production there.” Id. at 41. Mr. Flores did not unequivocally rule out future resumption of automobile production at the plant. “ ‘As of right now,’ he said, ‘we are not considering new production for the plant.’ ” Id. at 43 (emphasis added). Defendant also has submitted a January 26, 2005 article from The Star Ledger reporting that the date of termination of production at the plant has been extended to April 20, 2005 and that “GM has refused to say the plant located on Routes 1 & 9 is closing.” Joe Ryan, GM’s Linden plant gets 2 more months, Star Ledger, Union County Edition, Jan. 26, 2005, at 19.
The Evidence Rule on which plaintiff relies permits judicial notice of facts “so generally known or ... of such common notoriety within the area pertinent to the event that they cannot reasonably be the subject of dispute.” N.J.R.E. 201(b)(2). I conclude that plaintiffs announcement of the planned February 2005 shutdown of the subject plant and the extension of the shutdown date to April 20, 2005 were widely publicized and were “generally known” and of “common notoriety” in the Linden, New Jersey area. Therefore, pursuant to the Rule, I have taken judicial notice of the announcements. However, doing so has not affected the analysis and conclusions in this opinion. To a limited extent, this results from plaintiffs apparent equivocation as to the future of the plant. Mainly, however, the announced shutdown has had no effect on my analysis and conclusions because it is not relevant to the years under appeal. Those years are 1983 through 2003, although an appeal is pending for 2004 and, presumably, a 2005 appeal will be filed.
As of the assessment dates in issue, October 1, 1982 through October 1, 2002, and continuing on October 1, 2003 (for the 2004 appeal), the subject plant was a viable automobile assembly facili *157 ty, and plaintiff used and operated the entire plant for that purpose. Plaintiff presented no proofs that a shutdown or closing of the plant was planned or even under consideration as of any of those dates. Consequently, its November 30, 2004 announcement has no bearing on the highest and best use of the plant for the years under appeal, including 2004. See Owens-Illinois Glass Co. v. Bridgeton, supra, 8 N.J.Tax at 502-503 (holding that the highest and best use of a glass plant as of October 1,1983, was not affected by the shutdown of the plant by the end of that year or early in 1984). If the subject plant is closed and offered for sale, its highest and best use and value may change. Cf. Ford Motor Co. v. Edison Tp., supra, 127 N.J. at 300, 604 A.2d 580 (noting that, after Ford Motor Co. closed its Mahwah, New Jersey automobile assembly plant, Ford sold the plant for one-fourth the value Edison Township’s appraiser determined for the plant as an operating automobile assembly facility).

 This procedural summary corrects errors in the procedural history contained in my opinion in General Motors Corp. v. City of Linden, supra, 20 N.J.Tax at 258-59.

 In its Reply Brief, plaintiff describes this Order as requiring that the “market approach" (sometimes called the market data approach or the sales comparison approach) be available as a valuation methodology. My bench opinion of January 10, 2003 was the basis for the Order and explains that the Order's reference to “market data" meant data from the market and not the market data approach.

 The American Institute of Real Estate Appraisers and the Society of Real Estate Appraisers merged in 1991 to form the Appraisal Institute.

 All references hereafter to The Appraisal of Real Estate are to the twelfth edition, unless otherwise noted.

 Criteria 1 and 2 may be considered in reverse order.

 Defendant's proofs, discussed below in Section V, do not alter or affect these findings and conclusions.

 The plaintiff in the Seagram matter described the building as "unusually costly and beautiful” and "world-renowned for its striking and imposing beauty." Id. at 460, 200 N.E.2d at 448.

 Defendant’s appraiser valued the subject property at approximately $133,000,000 for 1983, $136,000,000 for 1984, and $140,000,000 for 1985. The Tax Court determined a value of approximately $94,000,000 for each year. General Motors Corp. v. City of Linden, supra, 12 N.J.Tax at 58.